STATE, Respondent, v. KEMP, Appellant

(44 N. W.2d 214)

(File No. 9168. Opinion filed October 3, 1950)

**John F. Lindley,** Chamberlain, **Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for Defendant and Appellant.

**Donald J. Porter,** State's Atty., Brule County, Chamberlain, **Sigurd Anderson,** Atty. Gen., for Plaintiff and Respondent.

**Robert D. Jones,** Milbank, **Fred A. Tinan,** Mitchell, **Roy E. Willy,** Sioux Falls, for South Dakota Sportsmen's Clubs, Inc., amici curiae.

RUDOLPH, J. The question presented in this appeal is whether the enactment of subdivision (9), § 25.0306, by Ch. 91, Laws of 1949, was within the power of the legislature. This section of our law provides,

"No license shall be issued to a nonresident for the hunting, taking or killing of any migratory waterfowl."

The trial court held the law valid. We agree with this holding.

The facts are without dispute. The defendant, a nonresident, was refused a license to hunt migratory waterfowl in this state and proceeded thereafter to hunt and kill a wild goose without such license. Defendant's acts were unlawful if the enactment of the above Ch. 91(9), Laws of 1949, was within the power of the legislature.

Defendant makes two principal contentions in this court; 1st, that the legislative act violates the 1916 treaty made between the United States and Great Britain, 39 U.S. Stat. at Large, 1702, and a similar treaty made in 1936 between the United States and Mexico, 50 U. S. Stat. at Large, 1311; 2nd, that the act violates Article IV, Sec. 2, Constitution of the United States, which provides:

"The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

■ There is statistical knowledge and certain facts which are so well known in this jurisdiction that they are the subject of judicial notice. We wish to briefly refer to these facts before discussing defendant's contentions. In the years preceding this enactment by our legislature South Dakota was a Mecca for nonresident pheasant hunters. No state enjoyed the abundance of pheasants this state had in the decade commencing 1940. The state had a population of approximately 600,000. Yet in 1945 there were 97,980 nonresident hunting licenses issued in this state, and in the fall of 1946 preceding the legislative session which enacted the first act excluding nonresidents from hunting migratory waterfowl, 85,595 nonresident licenses were issued. We interpolate here to say that the language used by Mr. Justice Holmes regarding migratory waterfowl in the case of State of Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 384, 64 L.Ed. 641, applies equally to the nonresident hunter who "yesterday had not arrived, tomorrow may be in another State and in a week a thousand miles away." It was the pheasant that attracted hunters to South Dakota. To give some protection to the pheasant against this horde of hunters it was necessary to restrict the hours of hunting. The hours for pheasant hunting commenced at 12 noon, which left the nonresident pheasant hunter with idle time during the morning hours. As a result many of these nonresident pheasant hunters would spend the morning hours hunting ducks and geese. It was duck and goose hunting in the morning and pheasant hunting in the afternoon. These facts were all within the knowledge of the legislature when this legislation was enacted.

■ The treaties entered into with Great Britain and Mexico are obviously for the purpose of conserving migratory birds. The Convention with Great Britain provides that the two countries, "being desirous of saving from indiscriminate slaughter and of insuring the preservation of such migratory birds * * * have resolved to adopt some uniform system * * *." The Convention with Mexico recites an identical purpose. To make effective these treaties Congress enacted the Migratory Bird Act, Secs. 703-711, Title 16 U.S.C.A. Sec. 708 of this Act provides:

"Nothing in sections 703-711 of this title shall be construed to prevent the several States and Territories from making or enforcing laws or regulations not inconsistent with the provisions of said conventions or of said sections, or from making or enforcing laws or regulations which shall give further protection to migratory birds, their nests, and eggs, if such laws or regulations do not extend the open seasons for such birds, beyond the dates approved by the President in accordance with section 704 of this title."

See also Regulation 12 adopted pursuant to Sec. 704, 16 U.S.C.A.

We find nothing in the treaties which makes absolute the right of nonresidents of South Dakota to hunt migratory birds in this state on the same basis as residents, and we believe it clear, that the treaties have no such purpose. The sole purpose of the treaties is to conserve migratory birds, and under the law and regulations enacted and promulgated pursuant to such treaties this state is at liberty to give migratory birds protection further than that given by the treaties and federal laws and regulations. We are of the view that the South Dakota law here under attack comes squarely within its authority to give "further protection to migratory birds". This law protects ducks and geese against a host of hunters who otherwise would be hunting these birds simply as an incident to pheasant hunting in South Dakota.

The right to take wild game has run the gauntlet in the courts. Any attempted review of the many cases would not be helpful. Suffice to say is that originally it was held that a state had almost absolute power to regulate the taking and disposition of wild life within its borders. This holding was based upon the theory that ownership of fish or animals ferae naturae is in the state for the benefit of its inhabitants, and not subject to the privilege and immunities clause of the federal constitution. Geer v. Connecticut, 161 U.S. 519, 16 St.Ct. 600, 40 L.Ed. 793; McCready v. Virginia, 94 U.S. 391, 24 L.Ed. 248. In State of Missouri v. Holland, supra, wherein the Migratory Bird Treaty Act was upheld, Justice Holmes, speaking for a majority of the court, critically questioned

the state ownership theory as applied to migratory birds when he said:

"To put the claim of the State upon title is to lean upon a slender reed."

This statement has apparently influenced the later decisions of the court culminating in the cases of Takahashi v. Fish and Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 and Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 1165, 92 L.Ed. 1460. In the last cited case the court said:

"The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. And there is no necessary conflict between that vital policy consideration and the constitutional command that the State exercise that power, like its other powers, so as not to discriminate without reason against citizens of other States."

■ Whether the holding in this case wipes out the whole ownership in the state theory we need not determine. Apart from the ownership theory there is another basis upon which a state may regulate the taking of wild game, including migratory birds. We, of course, refer to the exercise of the police power. While this power is not an absolute power, such as the power under the ownership theory, we nevertheless think it is an adequate basis upon which to justify the legislative act.

■ Acting under the police power the state may discriminate against citizens of other states provided there is substantial reason for the discrimination beyond the mere fact that they are citizens of other states. In the case of Patsone v. Commonwealth of Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 282, 58 L.Ed. 539, Justice Holmes gave clear expression to the extent of this power by the following:

"But we start with the general consideration that a state may classify with reference to the evil to be prevented, and that if the class discriminated against is or .reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question

is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. * * * The state 'may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses.' "

■ Chief Justice Vinson in the Witsell case gave summary expression to the same thought when he said with reference to the privileges and immunities clause, "* * * the purpose of that clause * * * is to outlaw classifications based on the fact of non-citizenship unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed."

There is another applicable principal which finds expression in the cases above referred to, that is, that the states should have considerable leeway in analyzing local evils and in prescribing appropriate cures.

■ The local evil in South Dakota was apparent. Thousands of nonresident hunters, lured to South Dakota by an abundance of pheasants, were putting in their idle hours, and their time after getting their limit of pheasants, hunting ducks and geese. There wae real danger that natural flyways and breeding ground and nursery for ducks and geese would be subject to excessive hunting and possible destruction. From experience we know that there would be no such influx of hunters except for the pheasant. Obviously the local resident who had his business or profession to occupy him was in entirely a different class from the nonresident hunter who was in South Dakota for the single purpose of hunting. The extent of duck or goose shooting by the resident was not increased or diminished to any appreciable extent by the excellent pheasant hunting. He was at home occupied with his daily tasks, hunting when he wished, but not shooting ducks or geese simply to occupy time that otherwise was not occupied. It is also a fact, too well known in South Dakota, that many nonresident hunters, not all, who have made the trip to this state perhaps at con-

siderable expense are not satisfied unless they get their limit of everything the law allows. We conclude, therefore, that nonresidents constitute a peculiar source of evil at which the statute was aimed. Whether the legislature could prescribe some other cure to meet the evil, to many is not an open question, but be that as it may, if there is to be any leeway left in the state to prescribe an appropriate cure we must conclude that the cure prescribed is appropriate and reasonable.

■ The above has been written on the assumption that hunting migratory waterfowl for sport is a privilege or immunity falling within the constitutional provision. However, this may well be doubted. To our knowledge it has never been so held. In the recent cases of Toomer v. Witsell, supra, and Takahashi v. Fish and Game Commission, supra, the court placed special emphasis throughout the opinions upon the fact that commercial fishing was involved, and the result was to deny to the excluded class the right to make a living by fishing. The right to make a living is a right inherent in the individual, and as such no doubt protected by the constitutional provision. Hunting for sport with no · commercial aspect attached seems to us to fall in an entirely different category. Involved only is a question of individual enjoyment, no property right is in issue nor is anyone denied the means of making a livelihood in competition with local citizens.

The trial court determined that the whole setup of our hunting laws and the eligibility for licenses thereunder is determined by residence and no requirement of citizenship is involved. Specifically the questioned statute refers only to nonresidents, there is no mention of citizenship. The reasoning of the trial court is persuasive, we quote:

"Defendant's contentions of unconstitutionality assume that by this act the legislature has discriminated against the citizens of other states. Let us consider what the statute does in fact say and mean. The prohibition is found in SDC 25.0306, as amended by Chap. 91, Laws of 1949, which provides that the issuance of hunting licenses shall be subject to the following restrictions: 1) No **resident** license shall be granted unless the applicant has been a bona fide resident

of this state for at least six months prior to the making of the application; 2) A **nonresident** or **visitor's** license shall be granted only to a person whose residence is not such as to qualify him for a resident license; 9) No license shall be issued to a nonresident for the hunting, taking or killing of any migratory waterfowl.

"It will be observed that the particular class of license to be issued, or whether any license whatever shall be issued is not dependent on citizenship. To be a citizen of South Dakota requires one year's residence but any person who in good faith has resided in this state for six months is entitled to a resident license although he has not yet become a citizen of this state.

"Whether a citizen of the state who has not also been a resident thereof for six months next preceding is entitled to a nonresident license to shoot migratory birds depends on the construction to be given subd. (9). The source of this subd. (9) as it now appears in Chap. 91, Laws of 1949, is Chap. 109, Laws of 1947, which added a subd. (9) to the eight subdivisions of Chap. 106, Laws of 1941, which was itself an amendment of SDC 25.0306. The title of the 1947 act describes it as amending the existing statutes, and the act itself recites that the previous statutes shall 'be amended by adding a new subdivision number (9) reading as follows: "No license shall be issued to a nonresident for the hunting, killing or taking of any non-migratory waterfowl." '

"Unless this term 'nonresident' takes a different meaning from the 1941 act to which it was annexed, it means one who does not reside in the state. A 'resident' is one who resides or dwells in a place for some time.

"If the term 'resident' is defined in the previous subdivisions of the act, it is in (1), (2), or (8). Subd. (1) limits resident licenses to bona fide residents of the state for at least six months, which by specifying a required period of residence and a good faith in its acquistion, necessarily assumes that there may be 'residence' in the absence thereof. Subd. (2) refers to a nonresident license as one to be granted where either good faith or period of residence is insufficient. Subd. (8) authorizes licenses to take fur-bearing an-

imals to persons 'who shall have **lived** in the state at least six months.'

"None of these provisions seem to control the meaning of 'nonresidents' as that term appears in Subd. (9). Vol. 5, Words and Phrases, Perm. Ed., defines 'domicile' as a matter of intention, but says, 'residence' is a physical fact, while 'bona fide residence' means residence with domiciliary intent.

"The legislature doubtless intended to exclude from migratory waterfowl shooting those who are not bona fide residents for the six months next preceding application. Whether this statute accomplishes that result need not concern us here, and I shall assume that the act has the effect of denying such right to nonresidents, including nonresident citizens of the state.

"The statute then must be construed by its own expressed terms as applying no test of citizenship, but as dealing with citizens of South Dakota and the other states alike."

The judgment appealed from is affirmed.

SMITH and SICKEL, JJ., concur.

HAYES, P.J., and ROBERTS, J., concur in result.