David B. TERK, Plaintiff,

v.

James D. RUCH, individually and as the Director of the Colorado Division of Wildlife, James C. Kennedy, Tim Schultz, Michael Higbee, Richard Divelbiss, Donald Fernandez, Wilbur Redden, James T. Smith and Jean Tool, individually and as members of the Colorado Wildlife Commission or comparable governing body of the Colorado Division of Wildlife, Defendants.

Civ. A. No. 84–M–1209.

United States District Court, D. Colorado.

Feb. 24, 1987.

Allen W. Stokes, Jr., Denver, Colo., Daniel E. Duncan, Albuquerque, N.M., for plaintiff.

Don D. Etter, Denver, Colo., Paul A. Lenzini, Washington, D.C., for amicus curiae Intern. Assoc. of Fish and Wildlife Agencies.

Linda E. White, Adonis A. Neblett, Natural Resources Section, Office of Atty. Gen., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

The question presented is whether the State of Colorado can unequally allocate and issue, as between Colorado residents and nonresidents, its licenses to hunt Bighorn Sheep ("Sheep") and Rocky Mountain Goat ("Goat"). The plaintiff, David Terk, a Texas resident, seeks to enjoin implementation of regulations of the Colorado Wildlife Commission (the "Commission") under which approximately 90 percent of the available Sheep and Goat permits are allocated to residents. Mr. Terk claims that the Colorado regulations violate the Privileges and Immunities Clause, U.S. Const., Art. IV, and the Equal Protection Clause of the Fourteenth Amendment. He also brings claims under the Commerce Clause, U.S. Const., Art. I, § 8, and 42 U.S.C. §§ 1981 & 1983. The case is before the court on the parties' cross motions for summary judgment.

■ Standing was raised as an issue for the first time during oral argument held before this court on February 6, 1987. In 1984, Mr. Terk applied unsuccessfully for a Sheep license. He did not apply for a Goat license. On this basis, the defendants claim he lacks standing to challenge the regulations as applied to Goats. The Commission's system of allocating and issuing Sheep and Goat licenses is identical, and Mr. Terk has standing to attack this system in its full application.

C.R.S. § 33–1–106 states in part:

(1) In order to provide an adequate, flexible, and coordinated statewide system of wildlife management and to maintain adequate and proper populations of wildlife species, the commission shall have authority in this state, by appropriate rules and regulations, to:

(a) Determine under what circumstances, when, in which localities, by what means, what sex of, and in what amounts and numbers the wildlife of this state may be taken....

Pursuant to this legislative authority, the Commission created 40 Sheep and 10 Goat management units, and established the system of unequal allocation of Sheep and Goat permits at issue in this case. The units are based on the distribution and ranging habits of the Sheep and Goat. Unit boundaries consist of identifiable physical features such as roads, rivers, and ridgelines. Each year, the Commission determines by field inventory the number of Sheep and Goat to be taken from each unit. License applications, whether resident or nonresident, are required to specify the

species and the unit applied for. For every unit in which the Commission has determined that ten or more Sheep or Goat may be hunted, ten percent of the licenses are allocated to nonresidents. In units where less than ten animals may be taken in a season, all licenses are allocated to Colorado residents. The number of licenses actually issued has differed from the Commission's allocations, apparently because of the Commission's practice of issuing licenses to residents for any nonresident allocations unclaimed due to insufficient applications for a given unit. Colo.Admin.Code, art. II, § 206(b)(3)(C).

Sheep and Goat are the only animals for which the Commission allocates permits un-

equally. Licenses for all other animals are drawn from a single pool without regard to state residency. The preferential allocation of Sheep and Goat began with the 1984 season. Prior to 1984, nonresident hunting of these animals was completely prohibited. It is worth noting that the practice of discriminating against nonresidents in the allocation of hunting licenses is widespread. More than twenty states either allocate their licenses unevenly, or completely prohibit nonresidents from hunting certain species.

The breakdown of applications received, licenses allocated, and licenses issued for 1984 and 1985 is as follows:

| Sheep: | Applications received | Licenses allocated | Licenses issued | Percent successful | Resident: Nonresident ratio |
|---|---|---|---|---|---|
| **1984** | | | | | |
| Residents | 1687 | 419 | 409 | 24.2% | 1:26 |
| Nonresidents | 421 | 16 | 16 | 3.8% | |
| **1985** | | | | | |
| Residents | 1805 | 389 | 374 | 20.7% | 1:10 |
| Nonresidents | 347 | 43 | 38 | 10.9% | |
| **Goat:** | | | | | |
| **1984** | | | | | |
| Residents | 486 | 86 | 86 | 17.7% | 1:43 |
| Nonresidents | 7 | 3 | 2 | 28.6% | |
| **1985** | | | | | |
| Residents | 483 | 75 | 76 | 15.5% | 1:11 |
| Nonresidents | 16 | 8 | 7 | 43.8% | |

Source: Answer to Plaintiff's Second Interrogatories, Appendix "C" to Plaintiff's Memorandum Brief in Support of Motion for Summary Judgment (Appendix "C"), at Interrogatories No. 3, 4.

The Commission does not explain why the resident to nonresident ratio in 1984 was one to twenty-six for Sheep and one to forty-three for Goat. In 1985, however, the ratio did accord with the Commission's one in ten policy. To support his position that the Commission's allocation scheme violates the Constitution, Mr. Terk relies heavily on *Terk v. Gordon,* No. 74–387–M (D.N.M.1977), *aff'd,* 436 U.S. 850, 98 S.Ct. 3063, 56 L.Ed.2d 751 (1978). In that case,

the same plaintiff sued the members of the New Mexico State Game Commission, challenging, on Art. IV Privileges and Immunities and Fourteenth Amendment grounds, a state law which authorized higher nonresident license fees and a New Mexico Game Commission "proclamation" which allocated unequally the available licenses for Sheep, Goat, Oryx and Ibex. The stated purposes for the uneven allocation were first, conservation, and second, preserving to New Mexico residents the right to hunt these species. *Terk v. Gordon,* No. 74–387–M, at 4–5, 14.

A three-judge district court heard the case pursuant to 28 U.S.C. § 2281, repealed

by Act Aug. 12, 1976, P.L. 94–381, §§ 1, 2, 90 Stat. 1119. The court held that New Mexico's differential fee structure did not violate the Privileges and Immunities Clause. It then went on to subject the fee differential "... to the analysis accorded to legislative classifications created in the exercise of the State's police power." *Terk v. Gordon*, No. 74–387–M, at 12. The court described that analysis as "... essentially the same ... as the equal protection test: whether the classification is reasonable and whether it is rationally related to a legitimate state object." *Id.* at 13. Under this analysis, the court found the disparity in fees to be reasonable and within the state's police power.

With respect to the allocation differential, the court stated:

> The effect of the allocation is to exclude non-residents who have already tendered the non-resident fee solely because they are non-residents. This is outside the limits of the police power.

> If it can be done at all, the power to preserve game for one's own citizens must be based on the ownership or trusteeship theory. The issue is whether the power of the state under the ownership or trusteeship doctrines of the earlier cases is absolute or whether it is limited in the same manner as the police power. We have observed a general reluctance to rely solely on the ownership or trusteeship theories, but we find no cases directly overruling the theories. [The ownership theory was subsequently overruled in *Hughes v. Oklahoma*, 441 U.S. 322, 335–336, 99 S.Ct. 1727, 1735–1736, 60 L.Ed.2d 250 (1979)]. The Supreme Court in *Kleppe* [*v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976)], supra, at 545, now characterizes the States' power over wild animals in the conjunctive as "trustee and police powers." The better view is that the Commission's authority to regulate game held in trust by the state is exercised under police power. We believe the New Mexico courts have so held. We conclude, therefore, that the allocation of licenses between residents and non-residents cannot be upheld.

*Id.* at 15 (citations omitted).

In ruling against the state's unequal allocation of permits, the court employed a police power analysis. The court did state, in that portion of its opinion regarding differential fees, that the police power and Equal Protection tests are the same. *Id.* at 13. This court therefore reads the court's holding as implicitly including the finding that no rational basis existed for the preferential allocation of hunting licenses to residents.

Mr. Terk appealed the district court's ruling on fees to the Supreme Court. The New Mexico Game Commission did not appeal the ruling on allocation. The Supreme Court affirmed, noting that the fee issue was controlled by *Baldwin v. Montana Fish & Game Commission*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), an opinion issued subsequent to the district court's opinion in *Terk v. Gordon*. The Court further stated: "We express no view, however, on the allocation issue as to which no review was sought." *Terk v. Gordon*, 436 U.S. at 851, 98 S.Ct. at 3063.

In *Baldwin*, the Supreme Court upheld Montana's elk licensing scheme against Art. IV Privileges and Immunities and Equal Protection challenges brought by a nonresident hunter. Under the scheme, nonresidents paid seven and a half times more than residents for an elk license. The plaintiffs conceded that some fee differential was constitutional, but argued that seven and half times was unrelated to cost equalization or any other permissible state objective.

Turning first to the Privileges and Immunities attack, the Court gave an historic overview of the Clause's scope and application, concluding that: "Only with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." *Baldwin v. Montana Fish & Game Commission*, 436 U.S. at 383, 98 S.Ct. at 1860.

The Court continued:

Does the distinction made by Montana between residents and nonresidents in establishing access to elk hunting threaten a basic right in a way that offends the Privileges and Immunities Clause? Merely to ask the question seems to provide the answer....

Appellants' interest in sharing this limited resource on more equal terms with Montana residents simply does not fall within the purview of the Privileges and Immunities Clause. *Equality in access to Montana elk is not basic to the maintenance or well-being of the Union.* Appellants do not—and cannot—contend that they are deprived of a means of a livelihood by the system or of access to any part of the State to which they may seek to travel. We do not decide the full range of activities that are sufficiently basic to the livelihood of the Nation that the States may not interfere with a nonresident's participation therein without similarly interfering with a resident's participation. *Whatever rights or activities may be "fundamental" under the Privileges and Immunities Clause, we are persuaded, and hold, that elk hunting by nonresidents in Montana is not one of them.*

*Id.* at 388, 98 S.Ct. at 1862–1863 (emphasis added).

The Court next addressed the Equal Protection argument. Finding that the statutory classification did not affect a fundamental right or suspect class, it applied a rational basis standard of review. The Court found Montana's differential fees rationally related to its stated purposes in passing the law. *Id.* at 389–391, 98 S.Ct. at 1863–1864. Those purposes were: limiting the number of hunter days in Montana to preserve a finite resource, spreading the cost of maintaining the elk habitat to non tax-paying nonresidents, rewarding residents for the forage support provided by private landowners, and alleviating the enforcement problems which the state claimed are caused mainly by nonresidents. *Id.*

Although the fit was not perfect, it was sufficient to withstand rational basis scrutiny:

The legislative choice was an economic means not unreasonably related to the preservation of a finite resource and a substantial regulatory interest of the State. It serves to limit the number of hunter days in the Montana elk country. There is, to be sure, a contrasting cost feature favorable to the resident, and, perhaps, the details and the figures might have been more precisely fixed and more closely related to basic costs to the State. But, as has been noted, appellants concede that a differential in cost between residents and nonresidents is not in itself invidious or unconstitutional. And "a statutory classification impinging upon no fundamental interest ... need not be drawn so as to fit with precision the legitimate purposes animating it.... That [Montana] might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional."

*Id.* at 390, 98 S.Ct. at 1863–1864, quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 813, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976).

Differential fees are not at issue in the instant case. The question before this court is whether Colorado's unequal allocation and issue of Sheep and Goat licenses violates the Privileges and Immunities Clause of Art. IV or the Equal Protection Clause.

■ The Privileges and Immunities Clause protects only those activities "bearing upon the vitality of the Nation as a single entity...." *Baldwin v. Montana Fish & Game Commission*, 436 U.S. at 383, 98 S.Ct. at 1860. Because recreational hunting is not such an activity, charging nonresidents a higher fee for the right to hunt Montana elk did not offend the Clause. *Id.* at 390, 98 S.Ct. at 1863–1864. Under this analysis, this court finds and concludes that Colorado's resident preference in its allocation of Sheep and Goat licenses does not impinge upon an activity

which bears upon the vitality of the nation as a whole, and, consequently, does not violate the Privileges and Immunities Clause.

■ Mr. Terk urges this court to follow the three-judge district court ruling in *Terk v. Gordon* striking down New Mexico's system of unequal allocation. As a preliminary matter, *Terk v. Gordon* is not binding on this court simply because it was decided by a three-judge district court which included one judge from the Tenth Circuit Court of Appeals. What authority exists on this question suggests that three-judge district courts had no greater authority than conventional district courts. *Dyer v. Rich*, 259 F.Supp. 736, 740 (N.D.Miss.1966) (actions of three-judge court must be regarded as actions of conventional district court), *Osage Tribe of Indians v. Ickes*, 45 F.Supp. 179 (D.D.C.1942), *aff'd* 133 F.2d 47 (D.C. Cir.), *cert. denied*, 319 U.S. 750, 63 S.Ct. 1158, 87 L.Ed. 1704 (1943) (three-judge court has all powers of district court). Nothing in the legislative history of the repeal of 28 U.S.C. § 2281 suggests that three-judge district courts had more authority than conventional district courts.

■ No suspect classification or fundamental right is implicated by the Colorado regulations at issue in this case. Sheep and Goat are hunted for their trophy value, not for sustenance. They have no legal commercial value, because their sale is prohibited under Colorado law. C.R.S. § 33–6–106. *See, Hughes v. Oklahoma*, 441 U.S. at 338–339, 99 S.Ct. at 1737–1738. The differential allocation does not restrict the right to travel to or through Colorado. The regulations here at issue concern recreational hunting, and *Baldwin* clearly held that recreational hunting is not a fundamental right. Thus, the Commission's regulations must be analyzed under the rational basis standard. Under this standard of review, the uneven allocation will stand if it is rationally related to a permissible state interest. *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–2517, 49 L.Ed.2d 511 (1976), *Hughes v. Alexandria Scrap Corp.*, 426 U.S. at 812–814, 96 S.Ct. at 2499–2500.

■ The Commission lists three reasons for its unequal allocation of Sheep and Goat licenses: (1) conservation and preservation of the herds; (2) assuring continued resident support for the animals (the "home support" argument); and (3) preserving to Colorado residents a preference in hunting these species.

The Brief *Amicus Curiae* of the International Association of Fish and Wildlife Agencies in Support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment (*"Amicus"*), which the defendants have adopted, contains a statement of the conservation argument:

> [The unequal allocation of permits] further[s] a conservation purpose because it controls and restricts pressure on a limited resource. In fact, by directly controlling the number of hunters who may take sheep and goat from the state, the Colorado regulations represent a more precise allocation mechanism than the fee differential scheme under attack in *Baldwin*, which merely had the potential to deter some nonresidents from applying for licenses.

*Amicus*, at 27 (citation omitted).

This argument is flawed. The conservation goal of regulating the number of animals taken bears no relation to whether residents or nonresidents do the killing. "From the Bighorn's point of view, the residency of the hunter is not relevant." *Terk v. Gordon*, No. 74–387–M, at 14.

*DeMasters v. State of Montana*, 656 F.Supp. 21 (1986), upholding a differential allocation in part on conservation grounds, is cation in part on conservation grounds, is distinguishable. In *DeMasters*, the plaintiff challenged Montana's unequal allocation of elk hunting licenses. Under Montana law, seventeen thousand nonresidents were eligible for licenses. No limit existed on resident licenses, and approximately ninety thousand were issued annually. Montana stated two reasons for this law: the conservation of wildlife and "the sacrifice which Montana residents have apparently made in foregoing development in

order to preserve wildlife habitat, clean air, and water." *DeMasters v. State of Montana,* 656 F.Supp. at 25.

The court upheld the allocation scheme against Privileges and Immunities and Equal Protection attack. Quoting from *Baldwin* —"equality in access to Montana elk is not basic to the maintenance and well-being of the Union", *Baldwin v. Montana Fish and Game Commission,* 436 U.S. at 388, 98 S.Ct. at 1863—the court found that the differential allocation, like differential fees, did not offend the Privileges and Immunities Clause. The court rejected the Equal Protection claim upon the finding of a rational connection between Montana's stated reasons for the law—conservation and resident sacrifice—and the means selected to further them:

There is no irrationality in Montana's legislative decision to utilize limitation of the number of nonresident big-game hunters as an effective game management tool.

Without [the sacrifice of Montana residents], survival of the elk herds would be jeopardized. The right asserted by plaintiff depends in large part on the sacrifice made by residents to preserve the opportunity to hunt. Nonresidents do not share in that lost economic opportunity or expense.

*DeMasters v. State of Montana,* 656 F.Supp. at 25.

In the context of Montana elk, the conservation reason is related to the unequal allocation. Although Montana issues over one hundred thousand elk licenses annually, there must be some limit. Limiting nonresidents while allowing unlimited licenses to residents does further the conservation purpose. In Colorado, the number of Sheep and Goat licenses to be allocated is fixed without regard to the number of applications received. Residents do not enjoy an unlimited right to hunt these animals. Therefore, conservation, as measured by limiting the numbers of hunters, is not served by preferring residents in the allocation of available licenses.

The second stated reason for the Commission's regulations is that the Sheep and Goat management programs are "absolutely dependent" on the volunteer help of Colorado residents. Defendants' Cross Motion for Summary Judgment, at 4–5. Residents allow the animals to graze on private land, assist in trapping and tagging projects, and contribute money through a voluntary check-off on their state income taxes. The Commission submitted affidavits stating that residents would not continue to offer their time, labor, money, and land if the hunting permits were equally allocated. While the defendants distinguish conservation from resident support, it is apparent that resident support is necessary for the well-being of both Sheep and Goat.

The following chart illustrates what would have happened if permit applications for the years 1984 and 1985 had been placed in a single pool without regard to the residency of the applicant:

| | Total # of applications received | Total # of licenses allocated | Total # of licenses issued | Overall success rate | Resident success rate under system actually used |
|---|---|---|---|---|---|
| Sheep: | | | | | |
| 1984 | 2108 | 435 | 435 | 20.6% | 24.2% |
| 1985 | 2152 | 432 | 412 | 20.5% | 20.7% |
| Goat: | | | | | |
| 1984 | 493 | 89 | 88 | 18.1% | 17.7% |
| 1985 | 499 | 83 | 83 | 16.6% | 15.5% |

This chart shows that the Commission's preferential allocation does not significantly improve a resident's chances of drawing a license over what they would be in a single pool. A resident's chances of drawing a Goat license would actually be better in a single pool. This is because the advantage to residents of the ninety percent allocation is offset by the fact that from eighty to ninety-eight percent of the applications come from residents. The residential preference does not give residents a better chance at a license than a single pool system.

The defendants argued at the February 6, 1987 hearing that resident support is linked to the *perception* that the nine-out-of-ten resident preference gives residents a better chance for a permit. The Commission's supporting affidavits predict that volunteer support would dwindle without the unequal allocation. However, these same affidavits portray the Bighorn as a unique animal. Rare, beautiful, and intelligent, it is an exciting challenge to hunt. Its lure might be sufficient to withstand a single pool system. Moreover, some of the home support for these animals, for example the Waterton Canyon project depicted in Exhibit "H" to the defendants' brief in support of its cross-motion for summary judgment, would prefer that the animals not be hunted at all. To these people, the odds of receiving a license to kill are irrelevant.

The Commission's third reason for the unequal allocation is "to preserve to Colorado residents a preference in hunting these animals." *Amicus*, at 23. The Commission's support for this position comes from *Martinez v. Bynum*, 461 U.S. 321, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983):

A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services for its residents are enjoyed only by residents. Such a requirement with respect to attendance in public free schools does not violate the Equal Protection Clause of the Fourteenth Amendment.

*Martinez v. Bynum*, 461 U.S. at 328, 103 S.Ct. at 1842 (Footnote omitted).

The Commission does supply some services. It introduced the non-indigenous Rocky Mountain Goat into Colorado, and it maintains the habitat and population of both Sheep and Goat. Without the Commission's activities, the animals might not exist in sufficient numbers for anybody, resident or nonresident, to hunt them. These services, however, are not equatable with the providing of free public education for Texas schoolchildren. Without denigrating the value of the Commission's work, its services are not so substantial or costly as to justify a preference to Colorado residents merely because they are Colorado residents.

Mr. Terk argues that home support is not a permissible objective, citing as authority a footnote in *Baldwin:*

The dissenting opinion in the [three-judge] District Court ascribes to the majority there a holding that "an otherwise invidious discrimination against non-residents is justified because the State may rationally consider the discrimination necessary to induce residents to support the State program required to conserve the herd." [*Montana Outfitters Action Group v. Fish & Game Commission*, 417 F.Supp. 1005, 1011 (D.Mont.1976).] We agree with that dissent that *the State's need or desire to engender political support for its conservation programs cannot by itself justify an otherwise invidious classification.* But, in our view, the record, that is, the case as proved, discloses that *the classification utilized in Montana's licensing scheme is not "otherwise invidious discrimination."*

*Baldwin v. Montana Fish and Game Commission*, 436 U.S. at 391–392, fn. 24, 98 S.Ct. at 1864, fn. 24 (emphasis added, citation omitted).

Like the Montana scheme, the Colorado allocation does not amount to "otherwise invidious discrimination". That phrase is generally used to describe discrimination against a suspect class or which impinges on a fundamental right.

The defendants rely heavily on *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488. *Hughes* concerned the constitutionality of a Maryland statute designed to rid that state of abandoned automobiles. The statute provided that anyone possessing an inoperable automobile over eight years old—a "hulk"—could transfer it to a licensed scrap processor, who could claim a "bounty" from the state for destroying it. A 1974 amendment to the law required the processor to submit title documentation to receive the bounty. Maryland processors were required to submit an indemnity agreement in which the person supplying the hulk certifies his right to it and agrees to indemnify the processor for any third-party claims arising from the vehicle's destruction. Non-Maryland processors had to submit a certificate of title, a police certificate vesting title, or a bill of sale from a police auction. A Virginia processor challenged the law on Commerce Clause and Equal Protection grounds. The Supreme Court upheld the law, stating on the Equal Protection question:

> Maryland argues that the distinction between domestic and foreign processors in the 1974 amendment is related to the basic statutory purpose of clearing Maryland's landscape of abandoned vehicles. Underlying this argument are the complementary assumptions that hulks delivered to Maryland processors are likely to have been abandoned in Maryland, and those delivered to non-Maryland processors are likely to have been abandoned outside Maryland. Based on these assumptions, the State contends that the 1974 amendment, by making it easy for an in-state processor to receive bounties but difficult for an out-of-state processor to do so, tends to ensure that the State's limited resources are targeted to hulks abandoned inside Maryland as opposed to some contiguous State.
>
> The District Court rejected this argument with the observation that Maryland had "not proffered a scintilla of factual support for [its] assumption that nonresident processors are more likely than in-state processors to claim bounties for vehicles abandoned outside of Mary-

land." 391 F.Supp. at 57. The District Court demanded too much. Maryland's underlying assumptions certainly are not irrational: in terms of likelihood, the Maryland Legislature reasonably could assume that a hulk destroyed by a non-Maryland processor is more likely to have been abandoned outside Maryland than is a hulk destroyed by a Maryland processor, and vice versa. The State is not compelled to verify logical assumptions with statistical evidence....

> [A] statutory classification impinging upon no fundamental interest, and especially one dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it. *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955). That Maryland might have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional....

> Few would contend that Maryland has taken the straightest road to its goal.... But in the area in which this bounty scheme operates the Equal Protection Clause does not demand a surveyor's precision. The 1974 amendment bears a rational relationship to Maryland's purpose of using its limited funds to clean up its own environment, and that is all the Constitution requires.

*Hughes v. Alexandria Scrap Corp.*, 426 U.S. at 811–814, 96 S.Ct. at 2498–2500.

In *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659, *reh'g denied*, 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981), the Court upheld a state statute banning retail sale of milk in plastic non-reusable containers but permitting such sales in non-reusable paperboard containers. The Court wrote:

> Whether *in fact* the Act will promote more environmentally desirable milk packaging is not the question: the Equal Protection Clause is satisfied by our conclusion that the Minnesota Legislature *could rationally have decided* that its ban on plastic nonreturnable milk jugs

might foster greater use of environmentally desirable alternatives....

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. at 466, 101 S.Ct. at 725 (emphasis in original).

Many other cases have discussed the proper standard to apply in a rational basis Equal Protection analysis. *See, e.g., Vance v. Bradley*, 440 U.S. 93, 109–110, 99 S.Ct. 939, 948–949, 59 L.Ed.2d 161 (1979) (perfection not required in drawing a classification, and court accepts such imperfection because "it is in turn rationally related to the secondary objective of legislative convenience." "[T]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker."); *City of New Orleans v. Dukes*, 427 U.S. at 303, 96 S.Ct. at 2516–2517 (classifications not involving suspect class or fundamental right are presumed constitutional; "states are accorded wide latitude in regulation of their local economies under their police powers and rational distinctions may be drawn with substantially less than mathematical exactitude"); *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408–1409, 22 L.Ed.2d 739 (1969) (classifications set aside only if "no grounds can be conceived to justify them"); *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) (uphold classification if "any set of facts reasonably may be conceived to justify" the discrimination); *United States v. Carolene Products*, 304 U.S. 144, 154, 58 S.Ct. 778, 784–785, 82 L.Ed. 1234 (1938) (inquiry restricted to whether any state of facts, either known or which could reasonably be assumed, affords support for the classification; statute in question upheld because question is "at least debatable"); *Winkler v. Colorado Department of Health*, 193 Colo. 170, 564 P.2d 107, 109–110 (1977) (upholding state health regulations prohibiting importation of pets for resale from states with licensing laws and regulations less strict than Colorado's, but exempting from this prohibition persons importing pets for breeding or personal use: "We see no basis for second-guessing the legislative determination that a diseased animal intended for commercial sale constitutes a greater health hazard than one removed from ... public exposure").

In light of the analytical standard involved, this court finds and concludes that the Commission's system of preferring Colorado residents does not violate the Equal Protection Clause. The method chosen to advance the legitimate state interest in gaining residential support for the Commission's Sheep and Goat programs is to allocate ninety percent of available Sheep and Goat hunting permits to Colorado residents. This creates in Colorado residents the perception that their chances of receiving a permit are better than if all the licenses were placed in a single pool without regard to the applicant's residency. As discussed above, that perception appears to this court to be largely faulty. In 1984 and 1985, the first two years in which nonresidents were allowed any Sheep or Goat licenses at all, the actual numbers often did not favor residents.

There were, however, situations where the system did slightly favor residents. Moreover, the perception of an advantage in getting permits, even if largely untrue, does appear to further the stated end of gaining and maintaining resident support for Sheep and Goat programs. Thus, although the Commission's system appears to this court to be flawed, it is not "irrational" as that term is used in constitutional analysis. This court cannot find that there is no "conceivable", *McDonald v. Board of Election Commissioners of Chicago*, or "at least debatable", *United States v. Carolene Products*, relationship between the underlying purposes of the Colorado regulations and the means chosen to achieve those purposes. This court cannot say it was unreasonable for the Commission to assume that a ninety percent resident preference would result in Colorado residents receiving more licenses than they would in a single pool of applicants. *Vance v. Bradley, United States v. Caro-*

*lene Products.* The system is not unconstitutional merely because it does not work in fact as planned in theory. The Commission could rationally have decided that the ninety percent resident preference would result in increased resident support for Sheep and Goat projects. *Minnesota v. Clover Leaf Creamery.* In sum, this court finds that the legitimate state interest in resident support for its Sheep and Goat programs bears a sufficiently rational relationship to the unequal allocation of licenses for these animals.

### 42 U.S.C. §§ 1981 and 1983

The plaintiff's §§ 1981 & 1983 claims fail. Section 1981 deals with discrimination on the basis of race. It does not extend to alleged discrimination on the basis of state residence. Section 1983 provides a private cause of action to redress Constitutional violations by state officials. Even if the Commission's allocation scheme were unconstitutional, such a finding would not rise to the level of a § 1983 violation.

### Commerce Clause

The plaintiff cites *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, for the proposition that the Commission's allocation system violates the Commerce Clause. In *Hughes,* the Court used the Commerce Clause to strike down an Oklahoma statute prohibiting the transportation of minnows out of state for purposes of sale. *Hughes* is completely dependent on the fact that the minnows were articles of commerce. *Hughes v. Oklahoma,* 441 U.S. at 338–339, 99 S.Ct. at 1737–1738, Sheep and Goat are not commerce. In fact, it is illegal to sell them. C.R.S. § 33–6–113. Moreover, *Hughes* was a commercial livelihood case; the Oklahoma statute interfered with the fundamental right to earn a living. Here, the parties agree that Sheep and Goat hunting is purely for sport. The Commerce Clause claim fails.

Upon the foregoing, it is

Ordered, the plaintiff's motion for summary judgment is denied, and it is

Further Ordered, the defendants' cross-motion for summary judgment is granted.