**TANGIER SOUND WATERMEN'S ASSOC., et al.,**

v.

**James E. DOUGLAS, Jr., Comm'r, Virginia Marine Resources Commission, et al., Defendants,**

and

**Maryland Dept. of Natural Resources, Defendant/Intervenor.**

Civ. A. No. 81–0229–R.

United States District Court,
E. D. Virginia,
Richmond Division.

June 25, 1982.

---

**23.** Note especially the balance of Mrs. Roxanne   Scott's testimony of December 22, 1980.

Alfred J. Owings, Spinella, Owings, Jackson & Steverson, Richmond, Va., Thomas N. Biddison, Jr., Thomas B. Lewis, Gallagher, Evelius & Jones, Baltimore, Md., for plaintiffs.

Brian L. Buniva, Frederick S. Fisher, Asst. Attys. Gen., Richmond, Va., for defendants.

Thomas A. Deming, Asst. Atty. Gen. of Maryland, Dept. of Natural Resources, Annapolis, Md., Anthony F. Troy, James E. Ryan, Jr., David G. Shuford, Mays, Valentine, Davenport & Moore, Richmond, Va., for defendant/intervenor.

## MEMORANDUM OPINION

WARRINER, District Judge.

### I

This action involves a constitutional challenge to several Virginia statutes that deny to nonresidents the right to commercially harvest blue crabs in the Virginia waters of Chesapeake Bay. Section 28.1–165 of the Virginia Code provides commercial crabbing licenses may be issued only to Virginia residents. Section 28.1–57 of the Virginia Code makes it a misdemeanor for a nonresident of the State to take or catch "fish" in any of the tidal waters of Virginia in any other

way "than by line, rod, or pole held in hand." [1] The term "fish" is defined by the Code to include, *inter alia*, "crustaceans ... and all other seafood." Thus crabs are fish within the meaning of the statute. Va. Code § 28.1–2 (1979). Similarly, section 28.1–122 of the Virginia Code makes it a misdemeanor for any nonresident to "take or catch fish or shellfish, in any waters of [Virginia] or at any of the waters under the jurisdiction of [Virginia], for market or profit." And, section 28.1–123 of the Virginia Code makes it a misdemeanor for a Virginia resident who for market or profit, is "concerned or interested" with any nonresident in taking or catching fish or shellfish in Virginia waters, or who knowingly permits a nonresident to engage in any such business.

Plaintiff Tangier Sound Watermen's Association (hereinafter "Association") is an unincorporated association of about 120 commercial fishermen residing in Maryland in communities on Smith Island and in the vicinity of Crisfield, Maryland, on the Eastern Shore of the Chesapeake Bay. Members of the Association are full-time or part-time crabbers. Several members of the Association have applied to the Virginia Marine Resources Commission for crabbing licenses and have received letters of refusal based on their nonresidency status. Thus, they are limited to crabbing in Maryland waters because of Virginia's residency laws.

The individual plaintiffs are all members of the Association and residents of the Maryland portion of Smith Island which itself is divided at its southern tip by the State boundary between Maryland and Virginia. Elmer W. Evans, President of the Association, derives approximately 95% of his annual income from the catching and selling of blue crabs. His vessel has been issued a permanent federal license of the type for vessels between five and twenty tons which are employed in carrying on the "mackerel fishery". *See* 46 U.S.C. § 251 *et seq.* In good weather it is practical for Evans to set crab pots within a range of up to 20 miles from his home port but the State boundary line effectively cuts in half the crabbing grounds which would otherwise be within range of Evans' vessel. The crabs which Evans does catch are sold to several buyers, including packers in Maryland, and markets in New York, Maryland, Washington, D. C., and Philadelphia.

Edwin C. Smith, III, derives approximately 50% of his annual income from the catching and selling of blue crabs. He supplements his income by buying and transporting crab bait from Virginia to Smith Island. Smith's vessel has been issued the same federal license as Evans. In good weather, it is practical for Smith to operate within a daily range of about 15 miles of his home port, but he too is limited by the location of the State boundary. His catch is sold to several buyers, including a packer in Crisfield, Maryland, and restaurants at Solomon's Island, in Maryland.

David L. Laird derives approximately 66% of his annual income from the catching and selling of blue crabs, principally soft crabs or "peelers". Laird owns and operates a crabbing skiff which because it is under five tons displacement does not qualify for federal licensing. It is, however, of typical size and type of crab scraper's boats for this area. In good weather, it is practical for Laird to operate within a range of 5 miles of his home port. Laird's catch is sold to several buyers, including packers in Crisfield, Maryland, wholesale fish dealers in Baltimore, and at the Fulton Fish Market in New York City.

The defendants are the Commonwealth of Virginia, the Virginia Marine Resources

---

**1.** Section 28.1–121 of the Virginia Code defines a nonresident as one "who is not a taxpayer in the State, and shall not have maintained his residence therein for one year and actually resided therein for the four months next preceding the time when he makes application for any privileges or license granted to residents under this Chapter; or unless he be a bona fide purchaser of land in this State and has actually lived within this State for the four months next preceding the time when he makes application for any privileges or licenses granted to residents under this Chapter...." Va.Code § 28.-1–121 (1979). Plaintiffs are not contesting the duration of the residency requirement of this Section and that issue is not before the Court.

Commission, which is the State administrative body charged with the enforcement of the fishery laws of Virginia, and James E. Douglas, Jr., the Commissioner of Marine Resources for Virginia and as such is the chief administrative officer of the State agency charged with enforcing the fishery laws of Virginia. The Maryland Department of Natural Resources moved to intervene as a party defendant on grounds that it was the agency charged with upholding a similar statutory scheme for the State of Maryland, and its motion was granted.

The instant litigation centers on the Atlantic Blue Crab which is an important commercially harvestable species of crustacean which is caught throughout the Chesapeake Bay and in the waters of the Atlantic Ocean along the east coast. The blue crab in following an annual migratory cycle, at times burrows beneath the floor of the Bay, crawls along its bottom, swims agilely through its waters, or meanders among the eel grasses at its margin. The blue crab is thus distinct from both the sedentary shellfish, such as an oyster, and the more mobile fin fishes. During the winter months male crabs migrate into the deeper channels in the center of the Bay and female crabs gather in the southerly portions of the Bay near the mouth. Both spend the winter submerged in the mud on the Bay floor. In the spring, the crabs emerge from their respective wintering grounds and join one another in the shallower, fresher tributaries and edges of the Bay where they spawn, hatch crab larvae, and feed among batches of eel grass or marsh vegetation. This annual cycle causes millions of crabs each year to traverse the boundary between Maryland and Virginia.[2]

The mobility of the adult crab also allows the species to adjust to changing conditions of salinity. With low rainfall, more saline waters move further up the Bay as do associated crab concentrations; after heavy rains crab populations are found in deeper, southern Bay waters. Year-to-year crab concentrations are found in those areas of the Bay experiencing reasonably stable cycles of salinity. However, commercial concentrations of blue crabs are widespread in the Bay, and are found in most Bay tributaries, with greatest abundance found along the Eastern Shore, most notably in Eastern Bay.

The optimum sustainable yield of blue crabs, which is the maximum harvest of crabs which can be obtained without creating any adverse impacts to the ability of the population to sustain itself, has yet to be determined for the Chesapeake Blue Crab Fishery. Such information as there is indicates that blue crab landings generally increased from the 1880's to the middle 1960's. Although landings have been subject to extensive fluctuations within relatively short periods of time,[3] these variations have tended to fluctuate near the mean throughout the years 1952 to 1979.[4]

The migratory nature of crabs requires the crabbing industry to accommodate itself to the wanderings of its quarry. However, during the several weeks each spring and fall when the migrating crabs have either not reached Maryland waters or have abandoned Maryland waters for the winter, plaintiffs are unable to fish in areas south of the Virginia boundary where crabs are yet abundant. Even during the summer season there are periods when crabs are relatively scarce in the areas near Smith Island north of the State line and plaintiffs again are barred from crabbing in nearby Virginia waters where there may be greater numbers of crabs available. All of the individual plaintiffs indicate that they are ready, willing, and able to crab in Virginia waters subject to the same restrictions as imposed upon Virginia watermen and that

2. *See generally Beautiful Swimmers—Watermen, Crabs and the Chesapeake Bay* by William W. Warner (Little, Brown & Co. 1976).

3. For instance, landings reached a high of 45000 metric tons in 1966 and were about one-half of that value two years later.

4. *See* B. J. Rothschild, P. W. Jones, J. S. Wilson, *Trends in Chesapeake Bay Fisheries,* contribution No. 1133, Center for Environmental and Estuarine Studies of the University of Maryland.

the sole reason that they do not do so now is that Virginia law excludes them. Defendants Douglas and the Virginia Marine Resources Commission have consistently refused to permit nonresidents including certain members of the Association, from commercially harvesting crabs.

Both Virginia and Maryland have substantial blue crab industries and for many years each State has regulated the exploitation of its blue crab resources in part by limiting commercial crabbing to the citizens of their respective States. This suit challenges the continuation of that practice in Virginia. Efforts to achieve a legislative solution have been unsuccessful. Faced with this complaint it falls to this Court to reach a determination as to the constitutionality of the present system. Virginia, notwithstanding the exclusion of nonresidents, imposes no limit on the number of Virginians who may commercially harvest crabs but does require each commercial crabber, crab buyer, or processor to obtain a license from the Virginia Marine Resources Commission upon payment of a tax which varies depending upon the type of gear used. See Va.Code § 28.1–165 (1979). There are also statutory regulations governing the various types of gear that may be used, see e.g., Va.Code § 28.1–166 (1979), the composition (but not the quantity) of one's catch, Va.Code § 28.1–167 (1979), and other geographical, seasonal and temporal restrictions. See Va.Code §§ 28.1–170 & 172 (1979).[5] Moreover, the Virginia Marine Resources Commission is authorized to limit the number of crabs taken by one boat in one day, Va.Code § 28.1–168 (1979), and to adopt other regulations consistent with the above statutory provisions. See Va.Code § 28.1–23 (1979).[6]

The marine police who enforce these regulations estimate they spend 20% of their enforcement activity on the crabbing regulations now in force. This activity involves enforcement both on the open water and at the commercial docks. Enforcement at the docks relates to limitations on the types and sizes of crabs caught and constitutes the primary source of control over the crab industry in Virginia. Other matters, such as requirements for licenses and gear limitations, generally must be enforced on the open water. There are several practical problems associated with open water enforcement. A relatively small number of officers must cover wide areas of the Bay, and the mobility of fishing vessels makes it difficult to patrol effectively. Moreover, if a violator must be taken into custody, the arresting officer must devote considerable time which would otherwise be spent on patrol. The use of alternatives such as citations is effective only where there is a reasonable belief that the violator will honor the citation. The respective heads of the Maryland and Virginia marine police believe that enforcement effectiveness would decline if the residency restrictions were lifted.

## II

This is a civil action for declaratory and injunctive relief arising under the Privileges and Immunities clause, Commerce clause, Supremacy clause, and Equal Protection clause of the United States Constitution. The matter in controversy, exclusive of interest and costs, involves a sum in excess of $10,000.00 as to each plaintiff. Accordingly, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331(a). Venue is proper in this judicial district pursuant to

---

**5.** See also Va.Code § 28.1–173 (1979) (Prohibition of placing crab trap or pound within 100 yards of any other crab trap or pound); Va. Code § 28.1–173.1 & 173.2 (1979) (pots to be identified with owner's license number and kept out of navigational channels); Va.Code § 28.1–174 (1979) (license exception for noncommercial catching of crabs for household use); Va.Code § 28.1–175–183.2 (1979) (inspection and regulation of fish packing houses by State Health Commissioner).

**6.** Pursuant to this authority, the Virginia Marine Resources Commission has promulgated several regulations pertaining to Licensing of crab traps and pounds (Reg. V), crab catch limits (Reg. VII), displaying of licenses (Reg. IX), and dredging (Reg. XII). Register of Regulations, Code of Virginia (Michie 1981–82).

28 U.S.C. § 1391(b). The parties have agreed to submit this case for decision on the merits through respective motions for summary judgment, and a stipulated set of facts. These motions are now ripe for consideration.

### III

Plaintiffs assert that Virginia's residency requirement violates the Privileges and Immunities clause, U.S.Const. Art. IV, § 2, cl. 1; the Commerce clause, U.S.Const. Art. I, § 8, cl. 3; and the Equal Protection clause, U.S.Const. Amend. XIV, § 1. They also argue that under the Supremacy clause, U.S.Const. Art. VI, § 2, plaintiffs that have been federally licensed pursuant to 46 U.S.C. § 251 *et seq.*, have been granted a right to fish in waters throughout the United States, including the Virginia portion of Chesapeake Bay, a right which is not subject to the prohibition of State law.

Virginia responds to plaintiffs' assertions with a bifurcated argument. Virginia asserts that commercial harvesting of blue crabs entails a physical invasion of the subaqueous bottom in that a crabpot will rest on the Bay bottom, covering it up, "scrapes" for peeler crabs will bring up eel grass and other seaweed from the bottom, and winter dredging will actually carve into the bottom for several inches to get the buried crabs. Virginia argues that even if there were a constitutional right to catch crabs in Virginia, plaintiffs would have no constitutional right to invade the State's Bay bottomlands without permission.

Virginia founds this argument on the theory that as it is the owner of the subaqueous bottomlands to the navigable waters within its jurisdiction, *Martin v. Waddell's Lessee*, 41 U.S. (16 Pet.) 367, 410, 10 L.Ed. 997 (1842); *McCready v. Virginia*, 94 U.S. 391, 394, 24 L.Ed. 248 (1876); *State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 373, 97 S.Ct. 582, 588, 50 L.Ed.2d 550 (1977); *Moore v. Hampton Roads Sanitation District Commission*, 557 F.2d 1030, 1038 (4th Cir. 1977) (*en banc*), it possesses all the rights of any private landowner to the surface and subsurface, with the exception that it may not interfere with the right of navigation in the water above its lands. *See Commonwealth v. Newport News*, 158 Va. 521, 546–47, 164 S.E. 689 (1932). Virginia argues that its proprietary right in the bottom endows it with the authority to sell, lease or otherwise allocate the right to use such property to whomever it chooses, including the right to bestow the privilege of using its bottomlands for commercial crabbing on her own citizens. *See Truax v. Raich*, 239 U.S. 33, 39–40, 36 S.Ct. 7, 9–10, 60 L.Ed. 131 (1915). It considers the crab laws a mere extension of its ownership rights and not an exercise of its police power. As such, Virginia claims to be acting in a proprietary capacity whereby it should be free from federal restraints.

In the alternative, Virginia argues that it has a compelling interest in its nonresidency laws in that they ensure effective enforcement of management regulations to properly protect the resource and to preserve peace over the crab ground. Virginia asserts that striking the residency laws would greatly hamper enforcement of present regulations, might necessitate more extensive regulations, and might threaten the crab resource as a whole. It contends these interests are sufficient to justify the exclusion of nonresidents.

Maryland, in support of Virginia, contends that the nonresidency laws should be examined under the Privileges and Immunities clause only, and that under such a test they pass constitutional muster as rational means to carry out the State's conservation and enforcement policies.

In *McCready v. Commonwealth*, 94 U.S. 391, 24 L.Ed. 248 (1877), the Supreme Court addressed the issue of whether Virginia could prohibit citizens of other states from planting oysters in Virginia's tidal waters when its own citizens were granted such a privilege. The Court clearly held that "each State owns the beds of all tidewaters within its jurisdiction, unless they have been granted away." 94 U.S. at 394, 24 L.Ed. 248. Moreover, said the Court, "the States own the tidewaters themselves, and the fish in them, so far as they are capable of ownership while running. For this pur-

pose the State represents its People, and the ownership is that of the People in their united sovereignty." 94 U.S. at 394, 24 L.Ed. 248.

The Court stated that the fisheries were not subject to the sort of paramount national interest as was navigation, that they remained under State control, and the State therefor had the right in its discretion to appropriate its tidewaters and its oyster beds to the use of its people as a common for taking and cultivating fish. "Such an appropriation is, in effect, nothing more than a regulation of the use by the People of their common property." 94 U.S. at 395, 24 L.Ed. 248. The Court held that the citizens of the Virginia "and they alone" owned the property to be sold or used, and they alone had the power to dispose of it as they saw fit. Thus, with emphasis primarily based upon ownership rather than upon citizenship, the Court held that Virginia could preclude non-citizens from engaging in the trade of producing oysters in Virginia beds despite the Privileges and Immunities clause of the Constitution. The Privileges and Immunities clause simply did not invest citizens of one State with any interest in the common property of citizens of another State and they therefore could be excluded. 94 U.S. at 395–96, 24 L.Ed. 248.

The success of Virginia's ownership theory must, in large part, ride or fall depending on the continued strength of the *McCready* opinion. And, in recent years the ownership theory set out in *McCready*, though not entirely discredited, has been considerably diluted by subsequent Supreme Court rulings, both under the Privileges and Immunities clause and the Commerce clause.

In *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977), the Supreme Court discussed the validity of two Virginia statutes that limited the right of nonresidents and aliens to catch menhaden, a free-swimming fin fish,

in the territorial waters of the State. Although many of the issues presently before this Court were raised in *Douglas*, in the lower courts, the Supreme Court decided the case on statutory grounds ruling that the Virginia statutes were pre-empted by the congressional enactment of the Enrollment and Licensing Act of February 18, 1793, 46 U.S.C. §§ 251–336. Although *Douglas* is thus of only tangential importance,[7] the Court did discuss the concept of State ownership of its natural resources.

In any event, "[t]o put the claim of the State upon title is," in Mr. Justice Holmes' words, "to lean upon a slender reed." *Missouri v. Holland*, 252 U.S. 416, 434 [40 S.Ct. 382, 384, 64 L.Ed. 641], 11 A.L.R. 984 (1920). A State does not stand in the same position as the owner of a private game preserve and it is pure fantasy to talk of "owning" wild fish, birds, or animals. Neither the States nor the Federal Government, any more than a hopeful fisherman or hunter, has title to these creatures until they are reduced to possession by skillful capture. *Ibid.*; *Geer v. Connecticut*, 161 U.S. 519, 539–540 [16 S.Ct. 600, 608–609, 40 L.Ed. 793] (1896) (Field, J., dissenting). The "ownership" language of cases such as those cited by appellant must be understood as no more than a 19th-century legal fiction expressing "the importance to its people that a State have power to preserve and regulate the exploitation of an important resource." *Toomer v. Witsell*, 334 U.S. [385] at 402 [68 S.Ct. 1156 at 1165, 92 L.Ed. 1460]; *See also Takahashi v. Fish & Game Comm.*, 334 U.S. 410, 420–421 [68 S.Ct. 1138, 1143, 92 L.Ed. 1478] (1948). Under modern analysis the question is simply whether the State has exercised its police power in conformity with the federal laws and Constitution.

431 U.S. at 284–85, 97 S.Ct. at 1751–1752.

Although the *Douglas* dictum considerably circumscribes the once broad ownership

---

7. Plaintiffs' third challenge to the Virginia residency statutes is that they are pre-empted by the same federal "enrollment" statutes as in *Douglas*. The necessity for a constitutional ruling in this matter, because some plaintiffs are not entitled to federal licensing protection,

encompasses the obvious ruling under *Douglas* that the Virginia statutes must yield to the Supremacy clause to the extent that they had been pre-empted by federal licensing statutes. *See* 431 U.S. at 283, 97 S.Ct. at 1751.

principle of *McCready*, the theory is not devoid of meaning or force. For in *Baldwin v. Montana Fish and Game Comm'n*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), a Privileges and Immunities case, the Supreme Court rejected the contention that *McCready* and the other "ownership" theory cases had no remaining vitality.[8] Rather, stated Blackmun, the language which had been discredited in the *Douglas* decision as being a 19th-century legal fiction nevertheless expresses,

> "The importance to its people that a State have power to preserve and regulate the exploitation of an important resource." [citation omitted]. The fact that the State's control over wildlife is not exclusive and absolute in the face of federal regulation and certain federally protected interests does not compel the conclusion that it is meaningless in their absence.

436 U.S. at 386, 98 S.Ct. at 1861. In *Hicklin v. Orbeck*, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), also in the Privileges and Immunities context, the Supreme Court again reviewed the ownership theory in rejecting Alaska's argument that the " 'privileges and immunities clause [does] not apply, and was never meant to apply, to decisions by states as to how they would permit, if at all, the use and distribution of the natural resources which they own....' " 437 U.S. at 528, 98 S.Ct. at 2489. The Court disagreed,

> that the fact that a State owns a resource, of itself, completely removes a law concerning that resource from the prohibition of the Clause, although some courts, including the court below, have read *McCready* as creating an "exception" to the Privileges and Immunities Clause. We have just recently confirmed that "[i]n more recent years ... the Court has recognized that the States' in-

terest in regulating and controlling those things they claim to 'own' ... is by no means absolute." *Baldwin v. Montana Fish and Game Comm'n.*, 436 U.S. at 385 [98 S.Ct. at 1861]. Rather than placing a statute completely beyond the Clause a State's ownership of the property with which the statute concerned is a factor—although often the crucial factor—to be considered in evaluating whether the statute's discrimination against noncitizens violates the Clause.

437 U.S. 528–29, 98 S.Ct. at 2489.

As discussed more fully in section V below, the Supreme Court has also eroded the force of the ownership theory as it applies to the Commerce clause. *See Hughes v. Oklahoma*, 441 U.S. 322, 332–334, 99 S.Ct. 1727, 1734–1735, 60 L.Ed.2d 250 (1979).

▪ In sum, the dilution of the ownership theory has been such that in the Court's analysis of a statutory scheme, "ownership" of a natural resource is but one factor that the Court must consider in determining whether a State has exercised its police power in conformity with federal laws and the Constitution. *See* 431 U.S. at 284–85, 97 S.Ct. at 1751–1752.[9]

Virginia argues that the blue crab is neither an oyster nor a finfish and that neither *McCready* nor *Douglas* should be controlling. Nevertheless, those two opinions, as refined by the Court's other decisions, do set the bounds within which the proper rule must lie and they clearly indicate that if Virginia is to prevail its statutes must satisfy the standards of the several applicable constitutional clauses in issue.

### IV

Plaintiffs' challenge under the Privileges and Immunities clause is based on the assertion that Virginia's statutes deny them the right to travel freely to pursue their liveli-

---

**8.** The Court made reference to *Corfield v. Coryell*, 6 Fed.Cas. 546 (C.D.E.D.Pa.1829), and *Geer v. Connecticut*, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896) the last case, however, being subsequently overruled in *Hughes v. Oklahoma*, 441 U.S. 322, 341, 99 S.Ct. 1727, 1739, 60 L.Ed.2d 250 (1979).

**9.** *See also* T. Lewis and I. Strand, Jr., *Douglas v. Seacoast Products, Inc.: The Legal and Economic Consequences for the Maryland Oystery*, 38 Md.L.Rev. 1 (1978).

hood. The early case of *Ward v. Maryland*, 79 U.S. (12 Wall.) 418, 20 L.Ed. 449 (1871), involved a tax upon nonresidents of Maryland who attempted to sell goods within the State of Maryland. The nonresident tax was much more onerous than a similar tax imposed upon the State's residents, and in a decision based squarely on the Privileges and Immunities clause, the Court stated:

> Attempt will not be made to define the words "privileges and immunities," or to specify the rights which they are intended to secure and protect, beyond what may be necessary to the decision of the case before the Court. Beyond doubt those words are words of very comprehensive meaning, but it will be sufficient to say that the clause plainly and unmistakably secures and protects the right of a citizen of one state to pass into any other state of the Union for the purpose of engaging in lawful commerce, trade or business, without molestation; to acquire personal property; to take and hold real estate; to maintain actions in the courts of the state; and to be exempt from any higher taxes or excises than are imposed by the state upon its own citizens. [citations omitted]
>
> Comprehensive as the power of the states is to lay and collect taxes and excises, it is, nevertheless, clear, in the judgment of the court, that the power cannot be exercised to any extent in a manner forbidden by the Constitution; and, inasmuch as the Constitution provides that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states, it follows that the defendant might lawfully sell, or offer or expose for sale, within the district described in the indictment, any goods which the permanent residents of the state might sell, or offer or expose for sale in that district without being subjected to any higher tax or excise than that engaged by law of such permanent residents. [citations omitted]

79 U.S. (12 Wall.) at 430, 20 L.Ed. 449. *See also Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869); *Corfield v. Coryell*, 6 Fed.Cas. 546, 552 (C.C.E.D.Pa.1823).

Notwithstanding this broad language, in *Corfield v. Coryell*, 6 Fed.Cas. 546 (C.C.E.D. Pa.1825), Justice Washington sitting as a Circuit Justice, in the first Privileges and Immunities case involving natural resources, had previously held that New Jersey's proprietary right in its fisheries was sufficient authority for it to limit use of its oyster beds to New Jersey residents without offending the Privileges and Immunities clause. *Id.* at 552. And, the Supreme Court reached the same conclusion with respect to Virginia in *McCready v. Virginia*, 94 U.S. (1877) six years after *Ward.* Both cases relied exclusively on the now questionable ownership theory.

In *Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1947), the Supreme Court considered the constitutional validity of several South Carolina statutes governing the commercial shrimp fishery in the three-mile maritime belt off its coast. The Court first dealt with its prior decision in *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), where there was language to indicate that a State no longer had an interest in the three-mile limit. The *Toomer* Court pointed out that indeed the State did retain an interest in that area even though the interest of the United States might be paramount. Such interests were sufficient for the State to exercise its police power to protect and regulate the fishery, subject, however, to the confines of generally applicable constitutional limitations. 334 U.S. at 393–94, 68 S.Ct. at 1160–1161.

The Privileges and Immunities issue in *Toomer* involved a licensing system whereby South Carolina charged a fee for nonresidents drastically higher than for residents. In its discussion thereof, the Court said of the Privileges and Immunities clause:

> The primary purpose of this clause ... was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy.

334 U.S. at 395, 68 S.Ct. at 1162 (footnote omitted). The Court continued that,

> [i]n line with this underlying purpose, it was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State. Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures.

334 U.S. at 396, 68 S.Ct. at 1162. (footnotes omitted)

In applying what has become the standard for this clause to South Carolina's admittedly discriminatory statute, the Court rejected the State's justification that the statute served to conserve its shrimp supply against the threat of excessive trawling.

> "[A]ppellees' argument assumes that any means adopted to attain valid objectives necessarily squares to the privileges and immunities clause. It overlooks the purpose of that clause, which, as indicated above, is to outlaw classifications based on the fact of non-citizenship unless there is something to indicate that non-citizens constitute a peculiar source of evil at which the statute is aimed."

334 U.S. at 398, 68 S.Ct. at 1163. The Court stated that other enforcement means were available and that the State could even charge out-of-staters an appropriately larger fee to compensate for excess costs necessitated by their fishing in South Carolina waters. But, there was no reasonable relationship between the danger presented by non-citizens as a class and the severe discrimination practiced upon them. The fact that some of the fishermen were nonresidents was not the "peculiar source of evil;" the alleged evil was resource depletion whatever the residence of the fishermen. 334 U.S. at 399, 68 S.Ct. at 1163–1164.

Having held that the South Carolina statute would violate the Privileges and Immunities clause, the Court went on to examine whether the statute might be saved by some unexpressed exception, such as the "ownership" theory. In addressing this issue, the Court, while not overruling *McCready*, again cast doubt as to *McCready's* continued force, particularly as it applies here. After noting the *McCready* rationale, the Court distinguished *McCready* as dealing with sedentary oysters which would remain in Virginia until removed by man whereas *Toomer* dealt with migratory free-swimming fish which traversed the waters of several States. The Court also noted that *McCready* involved the regulation of inland waters whereas *Toomer* involved regulation of the marginal sea. The Court recognized that despite the language in *McCready* stating it was not dealing with "a mere privilege or immunity," *McCready* "might be taken as reading an exception into the privileges and immunities clause." 334 U.S. at 401, 68 S.Ct. at 1165. The *Toomer* Court emphasized that even if the ownership theory might explain *McCready*, the factors that made *Toomer* distinguishable rendered ownership a weak prop for the South Carolina statute. The Court refused to apply it to the facts there at hand.[10]

**10.** In emphasizing the migratory nature of the fish as an important distinction from *McCready*, the Court looked to Justice Holmes' statement in *Missouri v. Holland*, 252 U.S. 416, 434, 40 S.Ct. 382, 384, 64 L.Ed. 641 (1920), that "to put the claim of the State upon title is to lean upon a slender reed," 334 U.S. at 401–402, 68 S.Ct. at 1164–1165, and went on to point out that as early as *Manchester v. Massachusetts*, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891), a unanimous Court had indicated that the

The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource. And there is no necessary conflict between that vital policy consideration and the constitutional command that the State exercise that power, like its other powers, so as not to discriminate without reason against citizens of other States.

These considerations lead us to the conclusion that the *McCready* exception to the privileges and immunities clause, if such it be, should not be expanded to cover this case.

334 U.S. at 402, 68 S.Ct. at 1165 (footnote omitted). Thus, the Court held that commercial shrimping in the marginal sea, "like other common callings," was within the purview of the Privileges and Immunities clause and that absent a reasonable relationship between the high degree of discrimination practiced upon nonresidents and the reasons advanced in support of the statute it would follow that the South Carolina statute violated the Privileges and Immunities clause. *Accord, Mullaney v. Anderson*, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952); *Gospodonovich v. Clements*, 108 F.Supp. 234 (E.D.La.1951), *appeal dismissed*, 344 U.S. 911, 73 S.Ct. 332, 97 L.Ed. 702 (1953).

In *Baldwin v. Montana Fish and Game Comm.*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), the Supreme Court upheld a Montana statute that imposed an extremely high license fees for nonresidents who wanted to hunt elk within the State. The lower court had held that the right to hunt elk in Montana was " 'no more than a chance to engage temporarily in a recreational activity in a sister state' and was 'not fundamental.' ... Thus, it was not protected as a Privilege and Immunity under the Constitution's Art. IV, § 2." 436 U.S. at 377, 98 S.Ct. at 1857. The Supreme Court itself stated that "the elk is not and never will be hunted commercially," 436

U.S. at 375 n. 11, 98 S.Ct. at 1856 n. 11, and quoted from the lower court's opinion to the effect that "[t]here is simply no nexus between the right to hunt for sport and the right to speak, the right to vote, the right to travel and the right to pursue a calling." 436 U.S. at 378, 98 S.Ct. at 1857.

In an extended discussion of the Privileges and Immunities clause, Justice Blackmun traced the development of the clause from its common source with the Commerce clause in the Articles of Confederation. 436 U.S. at 379–80, 98 S.Ct. at 1858–1859.

Justice Blackmun noted three major developments in the interpretation of the clause. In *Paul v. Virginia*, 19 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869), the Court had said that the clause "insures to [nonresidents] in other States the same freedom possessed by citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States an equal protection of their laws." 436 U.S. at 380, 98 S.Ct. at 1859, *quoting Paul v. Virginia, supra*, 19 U.S. at 180, 19 L.Ed. 357. The second development was in *Hague v. CIO*, 307 U.S. 496, 511, 59 S.Ct. 954, 962, 83 L.Ed. 1423 (1939), where the Court stated that the clause did not so much allow a citizen to carry the rights he had in his own State into other States, "but, on the contrary, that in any State every citizen of any other State is to have the same privileges and immunities which the citizens of that State enjoy. The section, in effect, prevents a State from discriminating against citizens of other States in favor of its own." 436 U.S. at 382, 98 S.Ct. at 1859, *quoting Hague v. CIO, supra*, 307 U.S. at 511, 59 S.Ct. at 962. The third development, according to Justice Blackmun, was in *Austin v. New Hampshire*, 420 U.S. 656, 660–61, 95 S.Ct. 1191, 1194–95 (1975), where it was said that the clause "establishes a norm of comity without specifying the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment." 436 U.S. at 382, 98 S.Ct. at 1859, *quoting Austin*

---

*McCready* rule "might not apply to free-swim-    ming fish." 334 U.S. at 402, 68 S.Ct. at 1165.

*v. New Hampshire, supra,* 420 U.S. at 660–61, 95 S.Ct. at 1194–1195.

Justice Blackmun also noted that the clause had been applied in specific cases to prohibit the imposing of unreasonable burdens on citizens of other States in their pursuit of common callings within a State, 436 U.S. at 383, 98 S.Ct. at 1860, *citing Ward v. Maryland,* 12 Wall. 418, 20 L.Ed. 449 (1871), in the ownership and disposition of privately held property within the State, *id., citing Blake v. McClung,* 172 U.S. 239, 19 S.Ct. 165, 43 L.Ed. 432 (1898), and in the access to the courts of a State. *Id., citing Canadian Northern R. Co. v. Eggen,* 252 U.S. 553, 40 S.Ct. 402, 64 L.Ed. 713 (1920).

Blackmun recognized there were circumstances where State citizenship or residency might properly be used by a State to distinguish among persons. For instance, a State is not prevented from restricting suffrage or the right to hold elective office to the citizens of its State nor must a State always apply all its laws or afford all its services equally to anyone.

> Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with the respect to those "privileges" and "immunities" bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally.

436 U.S. at 383, 98 S.Ct. at 1860.

The Court determined that, as between these two categories, access to recreational big game hunting was not the sort of activity protected by the Privileges and Immunities clause. Blackmun noted that the ownership theory espoused in *Corfield v. Coryell, supra; McCready v. Virginia, supra;* and *Geer v. Connecticut, supra; overruled, Hughes v. Oklahoma,* 441 U.S. 322, 341, 99 S.Ct. 1727, 1739, 60 L.Ed.2d 250 (1979), had indeed yielded to a recognition that:

> [T]he State's interest in regulating and controlling those things they claim to

"own," including wildlife, is by no means absolute. States may not compel the confinement of the benefits of their resources, even their wildlife, to their own people whenever such hoarding and confinement impedes interstate commerce. [citations omitted]. Nor does a State's control over its resources preclude the proper exercise of federal power. [citations omitted]. And a State's interest in its wildlife and other resources must yield when, without reason, it interferes with a nonresident's right to pursue a livelihood in a State other than his own, a right that is protected by Privileges and Immunities Clause.

436 U.S. at 385–86, 98 S.Ct. at 1861. But he rejected the assertion that ownership theories are wholly invalid.

> " 'Only last Term, in referring to . . . and characterizing [the "ownership" or title language of *Corfield, McCready,* and *Geer* ] "as no more than a 19th-century legal fiction," the Court pointed out that the language nevertheless expressed the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.' " [citations omitted]. The fact that the State's control over wildlife is not exclusive and absolute in the face of federal regulation and certain federally protected interests does not compel the conclusion that it is meaningless in their absence.

436 U.S. at 386, 98 S.Ct. at 1861–1862.

The crucial distinction which the Court drew was whether the proscribed or circumscribed activity involved a person's "commercial livelihood." To illustrate, the Court contrasted *Toomer* and *Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952), as "commercial livelihood" cases wherein discriminatory activity was struck down, with *State v. Kemp,* 73 S.D. 458, 44 N.W.2d 214 (1950), *appeal dismissed,* 340 U.S. 923, 71 S.Ct. 498, 95 L.Ed. 667 (1951), wherein the Supreme Court dismissed an appeal for lack of a substantial federal question where South Dakota prohibited all nonresidents from hunting migratory waterfowl within the State. In *Kemp,* not

only did the South Dakota court distinguish "commercial livelihood" cases from sport cases,[11] but it also required that South Dakota prove a danger that natural flyways, breeding grounds, and nurseries for ducks and geese would otherwise be subject to excessive hunting and possible destruction by hunters lured to the State by an abundance of pheasants. Finally, the South Dakota court required proof that nonresidents constituted a peculiar source of evil at which the statute was aimed. With this proof, the State court concluded the statute came within the leeway spoken of in *Toomer.*

Blackmun noted that notwithstanding the Supreme Court's prior opinions even Justice Washington in *Coryell* would oblige each State to treat each other's residents equally where a nonresident sought to engage in an essential activity or exercise a basic right. 436 U.S. at 387, 98 S.Ct. at 1862. Noting that this same principle had been inherent in the language of *Paul v. Virginia, supra,* 19 U.S. at 180, 19 L.Ed. 357; *Ward v. Maryland, supra; Canadian Northern Railway Co. v. Eggen, supra; Blake v. McClung, supra;* and *Toomer,*

which were concerned with the pursuit of common callings, the ability to transfer property, access to the courts, and commercial fishing licensing, respectively, he stated: "With respect to such basic and essential activities, interference with which would frustrate the purposes of the formation of the Union, the States must treat residents and nonresidents without unnecessary distinctions." 436 U.S. at 387, 98 S.Ct. at 1862.

Elk hunting, held the Court, was not such an activity whose foreclosure to nonresidents would threaten a basic right in a way offensive to the Privileges and Immunities clause. As stated by Blackmun, "[e]lk hunting by nonresidents in Montana is a recreation and a sport. . . . It is not a means to the nonresident's livelihood," and "[a]ppellants do not—and cannot—contend that they are deprived of a means of a livelihood by the system . . . ." 436 U.S. at 388, 98 S.Ct. at 1862.[12]

Shortly after *Baldwin,* the Supreme Court again addressed the Privileges and Immunities clause in *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397

---

11. In *State v. Kemp, supra,* the State court emphasized the distinction between commercial and recreational activity as follows:

    The [opinion] has been written on the assumption that hunting migratory waterfowl for sport is a privilege or immunity falling within the constitutional provision. However, this may well be doubted. To our knowledge it has never been so held. In the recent cases of *Toomer v. Witsell, supra,* and *Takahashi v. Fish & Game Comm., supra,* the court placed special emphasis throughout the opinions upon the fact that commercial fishing was involved, and the result was to deny the excluded class the right to make a living by fishing. The right to make a living is a right inherent in the individual, and as such no doubt protected by the constitutional provision. Hunting for sport with no commercial aspect attached seems to us to fall in an entirely different category. Involved only as a question of individual enjoyment, no property right is in issue nor is anyone denied the means of making a livelihood in competition with local citizens.

    73 S.D. at 465, 44 N.W.2d at 218.

12. Chief Justice Burger, in his concurring opinion, noted that the State "ownership" theory was somewhat of a "legal anachronism" but

that it was not completely obsolete in that it "manifests State's special interest in regulating and preserving wildlife for the benefit of its citizens." 436 U.S. at 392, 98 S.Ct. at 1865. He emphasized that *Corfield* and *McCready* were still good law insofar as their result was concerned, and that *"McCready v. Virginia, supra,* made it clear that the Privileges and Immunities clause does not prevent a State from preferring its own citizens in granting public access to natural resources in which they have a special interest." 436 U.S. at 393, 98 S.Ct. at 1865.

Burger noted that while the Privileges and Immunities clause had not been interpreted to prevent a State from preferring its own citizens in allocating access to wildlife within the State, a State does not have absolute freedom to regulate the taking of wildlife within its borders or over its airspace and that "once wildlife becomes involved in interstate commerce, a State may not restrict the use of or access to that wildlife in a way that burdens interstate commerce." 436 U.S. at 393, 98 S.Ct. at 1865; citing *Douglas v. Seacoast Products, Inc., supra,* 431 U.S. at 281–82, 97 S.Ct. at 1750; *Foster-Fountain Packing Co. v. Haydel,* 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928).

(1978), which involved a challenge to an Alaska statute which, *inter alia,* provided that Alaskans be favored in hiring for all work on the Alaska Pipeline. The professed purpose of the statute was to help reduce unemployment in the State. In applying the *Toomer* analysis to the case, the Court determined that Alaska had made no showing that nonresidents were the "peculiar source of evil" at which Alaska aimed its statute but that even if such a showing had been made the statute would still be invalid. Its discrimination against nonresidents did not bear a substantial relationship to the "evil" that nonresidents were said to present. 437 U.S. at 527, 98 S.Ct. at 2488. The statutory preference over nonresidents was given to all Alaskans, not just those who were unemployed. "If Alaska is to attempt to ease its unemployment problem by forcing employers within the State to discriminate against nonresidents—again, a policy which may present serious constitutional questions—the means by which it does so must be more closely tailored to aid the unemployed the Act is intended to benefit." 437 U.S. at 528, 98 S.Ct. at 2488.

The Court rejected Alaska's "ownership" argument that State ownership of the resources would take the statute in question without the scope of the Privileges and Immunities clause. The Court, though recognizing that ownership of a natural resource was a factor—"often the crucial factor"—to be considered in determining whether the State's discrimination against non-citizens violated the clause, 437 U.S. at 528–29, 98 S.Ct. at 2488–2489, held that Alaska's ownership of the oil and gas constituted insufficient justification for the statute's pervasive discrimination against nonresidents. 437 U.S. at 532, 98 S.Ct. at 2491. There, the statute's reach encompassed employers who had no connection with the State's oil and gas, performed no work on State land, had no contractual relationship with the State, and received no payment from the State; moreover, the Act's coverage was not limited to activities directly connected with the extraction of Alaska's oil and gas.

In reaching this conclusion, the Court drew from the reasoning of several Commerce clause cases. *See West v. Kansas Natural Gas Co.,* 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911); *Pennsylvania v. West Virginia,* 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); *Foster Packing Co. v. Haydel,* 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928). Looking to *Foster Packing,* the Court noted that case limited the extent to which a State's purported ownership of certain resources could serve as a justification for the State's economic discrimination in favor of its own residents. "[B]y permitting its shrimp to be taken and all the products thereof to be shipped and sold in interstate commerce, the State necessarily releases its hold and, as to the shrimp so taken, definitely terminates its control." 437 U.S. at 533, 98 S.Ct. at 2491, *quoting Foster Packing Co. v. Haydel, supra,* 278 U.S. at 13, 49 S.Ct. at 4–5. The *Hicklin* Court concluded that:

> *West, Pennsylvania v. West Virginia,* and *Foster Packing* thus establish that the Commerce Clause circumscribes a State's ability to prefer its own citizens in the utilization of natural resources found within its borders, but destined for interstate commerce.... Although the fact that a State-owned resource is destined for interstate commerce does not, of itself, disable the State from preferring its own citizens in the utilization of that resource, it does inform analysis under the Privileges and Immunities Clause as to the permissibility of the discrimination the State visits upon non-residents based on its ownership of the resource.

437 U.S. at 533–34, 98 S.Ct. at 2491. The Court held that considering the national importance of the product and the breadth of discrimination mandated by the Act, the statute must fall. 437 U.S. at 534, 98 S.Ct. at 2491–2492.

■ Other than Virginia's "ownership" theory, the only reasons advanced for the discrimination against Marylanders in this case are the problem of conservation and the problem of law enforcement. The problem of conservation would be exacerbated by the nonresident nature of citizens from

Maryland, or any other nonresidents. But the degree of discrimination against Marylanders bears no close relation to the difficulties envisioned. No matter how much leeway is given to Virginia in analyzing the evils and prescribing appropriate cures, the argument before this Court and the evidence presented shows that the harm to be foreseen by increased harvesting of Virginia crabs is not from additional harvesters *from Maryland,* but merely from additional harvesters. The impact on crabs would be the same whether the additional harvesters are Virginians, Marylanders or North Carolinians. Thus, the prohibition against Marylanders harvesting crabs in Virginia waters based on a conservation ground is not supported by the evidence, especially as there is no limitation upon the number of Virginians who may pursue the calling. Moreover, in contrast with *Kemp,* Virginia has come forward with no evidence that additional crabbers in Virginia waters will threaten the crab fishery.

Virginia has endeavored through its statutes to place almost the entire burden of conservation on nonresidents, with no showing that they are the source of the evil. This Virginia cannot do. A crabber, whether from Maryland or Virginia, must be free to engage in his livelihood of pursuing his peripatetic quarry subject only to reasonable, nondiscriminatory rules related to those Virginia imposes on its own citizenry.[13]

The evil anticipated with respect to the problem of law enforcement does appear to lie in the fact of nonresidency itself. This evil has been overcome on the Potomac River, which belongs to Maryland and which is regularly harvested by Virginia watermen, and it can, as easily, be overcome on the Chesapeake. Similarly, the problem has been overcome on the State's highways where commercial traffic from all States are required to obey Virginia traffic laws. While the enforcement of Virginia traffic laws against nonresidents is not perfect, it is certainly tolerable. No more could be asked in the enforcement of its fishery laws.

Virginia may be required to enact new regulations for the crabbing industry, but in so doing, they must be of uniform application. To the extent that allowing nonresidents to harvest crabs in Virginia waters results in additional costs, the State may, of course, charge nonresidents a reasonable and appropriately higher fee.[14]

As the Virginia statutes presently stand, however, they impermissibly foreclose Marylanders from pursuing their calling as commercial crabbers in such a way that is repugnant to the Privileges and Immunities clause of the Constitution.

V

Plaintiffs also challenge the Virginia statutes as imposing an undue burden on interstate commerce.[15] They argue that

**13.** In *Toomer,* the Supreme Court indicated that State might charge nonresidents a higher fee to compensate the State for any added enforcement burden they may necessitate or for any conservation expenditures from taxes which only residents pay. 334 U.S. at 398–99, 68 S.Ct. at 1163–1164.

**14.** See note 13, *supra.*

**15.** In *Pike v. Bruce Church,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the Supreme Court established the current standard to be applied in Commerce clause cases:

Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 U.S. 440 [80 S.Ct. 813, 4 L.Ed.2d 852]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach resolving these issues, *Southern Pacific Co. v. Arizona,* 325 U.S. 761 [65 S.Ct. 1515, 89 L.Ed. 1915] but more frequently it is spoken in terms of "direct" and "indirect" effects and burdens.

the commercial harvesting of crabs is an aspect of interstate commerce in and of itself and that Virginia should be proscribed from reserving such an activity for its residents.

Virginia counters that its residency laws neither bar nor burden interstate commerce. It argues that the State regulations impose no restrictions upon commerce in crabs but only deny nonresidents the use of State-owned subaqueous lands for commercial crabbing. Once captured, it is argued, Virginia crabs become a resource of the nation available to be shared with every other State. Pl. Br. at 16. Virginia contends that, in contrast to *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), and *Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), where the interstate shipment of minnows and waste products were hampered, there is no such prohibition here that restricts the interstate shipment of crabs or that might be construed as opposition to a single national market for crabs.

Here too, Virginia relies on an "ownership" theory in resisting the Commerce clause challenge much in the same vein as it did in *McCready v. Virginia*, 94 U.S. 391, 24 L.Ed. 248 (1877), but modified in this case to account for the erosion of the force of that opinion. Whereas in *McCready* the Court determined that the State owned both the tidewaters themselves and the fish in them, here Virginia can only maintain the right to control the use of the Bay floor.

The Maryland intervenors assert that the Commerce clause is inapposite, except for purposes of analogy, to this case. Maryland insists that the proper analysis is under the Privileges and Immunities clause. Maryland distinguishes plaintiff's Commerce clause authority. Thus, in *West v. Kansas Natural Gas Co.*, 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911), the State sought to retain natural gas produced within its borders solely for the use of its citizens. In *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), Oklahoma attempted to restrict entirely the export from the State of natural minnows caught within the State. In *Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), the State of South Carolina required owners of shrimp boats to unload and pack their catches in South Carolina before shipment out of state.[16] In *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928), which was cited in *Toomer*, Louisiana attempted to prohibit the export of shrimp prior to intrastate processing. In each of these cases, the Supreme Court concluded that the State restriction on export, or the requirement for intrastate processing prior to export, burdened interstate commerce in the particular resources. Maryland contends that the Virginia statutes have no such similar effect burdening interstate commerce in crabs. It emphasizes that there are no restrictions on the shipment of harvested crabs in interstate commerce.

397 U.S. at 142, 90 S.Ct. at 847.
In *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), the Supreme Court reiterated the *Pike* test as follows:
[W]e must inquire (1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce. The burden to show discrimination rests on the party challenging the validity of the statute, but "[w]hen discrimination against commerce ... is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the

statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interest at stake."
441 U.S. at 336, 99 S.Ct. at 1736.

**16.** Notable in *Toomer* was the Court's ruling that another statute which imposed a tax on certain shrimp taken within the maritime belt did not violate the Commerce clause. The Court stated that, "[taxing the taking of shrimp] does not discriminate against interstate commerce in shrimp, and the taxable event, the taking of shrimp, occurs before the shrimp could be said to have entered the flow of interstate commerce." 334 U.S. at 394–95, 68 S.Ct. at 1161–1162. *But see, Douglas v. Seacoast Products, Inc., supra*, 431 U.S. at 282 n. 17, 97 S.Ct. at 1750 n. 17 (qualifying this aspect of *Toomer*).

■ The Court must determine initially whether the Commerce clause is applicable to regulations affecting the harvesting of crabs. The situation before the Court is different from those previously addressed by the Supreme Court in its consideration of the Commerce clause. First, as Maryland points out, Virginia places no restriction whatsoever on the interstate movement of harvested crabs. Second, Virginia does, however, discriminate against nonresidents by foreclosing their access to crabs as yet uncaught. And, third, with the exception of the federal licensing program, Congress has not enacted legislation regulating the blue crab fishery.

The early interpretations of the Commerce clause suggest that the activity involved here would be without the scope of the Commerce clause. In *McCready v. Virginia, supra,* the Supreme Court held that the planting and cultivating of oysters was not an aspect of commerce because it involved neither transportation nor exchange of commodities, and was therefore not subject to the Commerce clause. The Court noted that although Virginia's interests in the river bottom had to yield to paramount federally protected rights of navigation, no such power existed over fisheries. In so ruling, the Court analogized to the planting of corn upon dry land, stating that "[c]ommerce has nothing to do with land while producing, but only with the product after it has become the subject of trade." 94 U.S. at 396, 24 L.Ed. 248.[17]

**17.** The Court reasoned that Virginia, as owner of the bottoms, had granted exclusive use of it to the citizens of Virginia which enabled them to produce what the people in other States could not, "but that is because they own property which the others do not. Their productions do not spring from commerce, but commerce to some extent from them." 94 U.S. at 397, 24 L.Ed. 248. *See also, Geer v. Connecticut,* 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896), *overruled, Hughes v. Oklahoma,* 441 U.S. 322, 332, 99 S.Ct. 1727, 1734, 60 L.Ed.2d 250 (1979).

**18.** The Supreme Court has relegated the "ownership" of natural resources as standing for nothing more than an assurance that the State has power to preserve and regulate the exploitation of an important resource within the constitutional limitations of the police power. *Hughes v. Oklahoma,* 441 U.S. 322, 332, 99

In *Toomer v. Witsell, supra,* the Supreme Court specifically held that the taking of shrimp was not an aspect of interstate commerce, at least for tax purposes, and that a nondiscriminatory tax on the taking would stand against a Commerce clause challenge. 334 U.S. at 394, 68 S.Ct. at 1161. In contrast, a statute requiring that all shrimp be processed intrastate prior to export fell before the Commerce clause. 334 U.S. at 406, 68 S.Ct. at 1167. Even the dissent of Justice Field in *Geer v. Connecticut,* 161 U.S. 519, 538, 16 S.Ct. 600, 607–608, 40 L.Ed. 793 (1896) whose analysis was "embraced" by the Court in *Douglas v. Seacoast Products, Inc., supra,* 431 U.S. at 284, 97 S.Ct. at 1751–1752; *Hughes v. Oklahoma,* 441 U.S. 322, 332–334, 99 S.Ct. 1727, 1734–1735, 60 L.Ed.2d 250 (1979), indicated that the Commerce clause did not attach until an animal was captured, at which time it became an "article of commerce." 161 U.S. at 538, 16 S.Ct. at 607–608 (Field, J., dissenting) ("when any animal ... is lawfully killed for the purposes of food or other uses of man, it becomes an article of commerce.")

The Supreme Court's recent deliberations on the Commerce clause, however, take a broader view of the Commerce clause so as to suggest, tentatively, its applicability here. If so, the Court has little doubt that the statutes would fall under the present guidelines of *Pike* and *Hughes.*[18]

In *Douglas v. Seacoast Products, Inc., supra,* the Supreme Court stated that:

S.Ct. 1727, 1734, 60 L.Ed.2d 250 (1979); *Douglas v. Seacoast Products, Inc., supra.* Moreover, to the extent that the "ownership" theory remains valid at all it would provide no escape for Virginia here. Where Virginia as owner of the Bay floor attempts to regulate its exploitation, it operates more as a market regulator than a market participant. *See Reeves, Inc. v. Stake,* 447 U.S. 429, 434–439, 100 S.Ct. 2271, 2276–2278, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). This case would thus be analogous to *Smith v. Department of Agriculture of the State of Georgia,* 630 F.2d 1081 (5th Cir. 1980), *cert. denied,* 452 U.S. 910, 101 S.Ct. 3040, 69 L.Ed.2d 412 (1981), where Georgia's ownership of the Columbia Farmer's Market did not entitle the State, in contravention of the Commerce clause, to assign nonresidents less desirable stalls in the market than Georgia residents. When a State acts as a

[w]hile [it] may be correct ... that at earlier times in our history, there was some doubt whether Congress had power under the Commerce clause to regulate the taking of fish in state waters,[16] there can be no question today that such power exists where there is some effect on interstate commerce. [citations omitted]. The movement of vessels from one state to another in search of fish, and back again to processing plants, is certainly activity which Congress could conclude affects interstate commerce. [Citations omitted].[17] (footnotes in original)

431 U.S. at 281–82, 97 S.Ct. at 1750.[19]

The Court buttressed this language with a discussion of the analogous menhaden fishery and the dangers it saw in individual State regulation thereof.

The business of commercial fishing must be conducted by peripatetic entrepeneurs moving, like their quarry, with no regard for State boundary lines. Menhaden that spawn in the open ocean or in coastal waters of a Southern State may swim into Chesapeake Bay and live there for their first summer, migrate south for the following winter, and appear off the shores of New York or Massachusetts in succeeding years. A number of coastal States have discriminatory fisheries laws, and with all natural resources becoming increasingly scarce and more valuable, more such restrictions would be a likely prospect, as both protective and retaliatory measures. Each State's fishermen eventually might be effectively limited to working in the territorial waters of their residence, or in the federally controlled fishery beyond the three-mile limit. Such proliferation of residency requirements for commercial fishermen would create precisely the sort of Balkanization of interstate commerce activity that the Constitution was intended to prevent. [cita-

tions omitted]. We cannot find that Congress intended to allow any such result given the well-known construction of federal vessel licenses in Gibbons [v. Ogden, 9 Wheat 1, 6 L.Ed. 23 (1824)].

This dictum clearly indicates that if Congress had chosen to regulate the crab industry it would have the power to do so under the Supreme Court's view of the Commerce clause, the language of McCready regarding the planting of corn notwithstanding. See Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Moreover, the Court's subsequent interpretation of the term "commerce" at least implies that a court could find the reach of the clause, in the absence of Congressional action, to be coextensive. In Hughes v. Oklahoma, supra, the Court reiterated what it had first held in Philadelphia v. New Jersey, supra:

[T]here is no two-tiered definition of commerce. The definition of "commerce" is the same when relied on to strike down or restrict state legislation as when relied on to support some exertion of federal control or regulation.

441 U.S. at 326 n. 2, 99 S.Ct. at 1731 n. 2; Philadelphia v. New Jersey, supra, 437 U.S. at 621–23, 98 S.Ct. at 2534–2535.

An expansive reading of this language would appear to sweep the challenged regulations within the proscriptive scope of the Commerce clause. Such an extreme reading of Douglas and the Commerce clause to reach the instant case, however, seems unwarranted, particularly considering more circumspect language by the Court elsewhere. First, in Douglas itself the Court recognized that the lack of Congressional pre-emption may limit the scope of the Commerce clause's proscriptive force. "The restrictions imposed by the Commerce clause standing alone may well be less than the pre-emptive reach of statutes passed by

regulator of trade, rather than as a participant, it must be even-handed. In Smith, the Court applied the three-prong test set out by the Supreme Court in Hughes v. Oklahoma, supra, and determined the practice to be invalid.

If this Court were to determine the Commerce clause to be applicable here, the Court

would be compelled to conclude that the Virginia statutes would fail under similar analysis.

19. At footnote 16 in Douglas, the Court cited McCready and Geer. In footnote 17, the Court qualified its earlier language in Toomer, previously discussed, supra at note 16.

Congress pursuant to the power. *Cf. Wickard v. Filburn*, 317 U.S. at 121–122 [63 S.Ct. at 87–88]." 431 U.S. at 282 n. 17, 97 S.Ct. at 1750 n. 17. As this language was not rejected in *Hughes v. Oklahoma, supra,* it presumably is still valid.[20] This view is strengthened by the last sentence of the above quoted discussion of the menhaden fishery which indicates the Court's frame of reference in *Douglas* was a situation where Congress *had* pre-empted a particular field. Elsewhere in *Douglas,* the Court distinguished contrary results and language in *Toomer, see,* 431 U.S. at 282 n. 17, 97 S.Ct. at 1750 n. 17; *McCready,* and *Geer, see* 431 U.S. at 285 n. 21, 97 S.Ct. at 1752 n. 21, as attributable to situations where plaintiffs had not asserted pre-emptive acts of Congress. As Congress has not endeavored to regulate the blue crab fishery in Chesapeake Bay, other than incidentally through federal licensing,[21] the Court is wary to expand the Commerce clause to engulf such a long standing system, previously unchallenged, on such tenuous authority.

Second, the Court is hesitant to expand the implications of the *Douglas* dictum to the instant case as such an interpretation would expand Commerce clause coverage to a situation where the State regulations do not restrict the buying, selling, trading or any other aspect of the interstate movement of articles of commerce. *See Hughes v. Oklahoma,* 441 U.S. 322, 328–329, 99 S.Ct. 1727, 1732–1733, 60 L.Ed.2d 250 (1979), *quoting Geer v. Connecticut,* 161 U.S. 519, 538, 541–542, 16 S.Ct. 600, 607, 609, 40 L.Ed. 793 (Field, J., dissenting).[22]

In *Philadelphia v. New Jersey, supra,* decided subsequent to *Douglas,* the Court struck down as repugnant to the Commerce clause a New Jersey statute prohibiting the importation of commercially worthless solid or liquid wastes from other States to New Jersey landfills. The argument was made that since the commerce involved worthless, indeed unwanted, commodities, a lesser federal scrutiny under the Commerce clause was appropriate. There, as here, the State statute was not the subject of any pre-emptive federal legislation. In rejecting a two-tier argument, the Court emphasized that it was "objects of interstate trade [that] merit Commerce Clause protection," 437 U.S. at 622, 98 S.Ct. at 2534, and any State regulation of such commodity is subject to Commerce clause scrutiny, despite the absence of Congressional action. Thus, the Court's ruling was on a narrow point and probably does not support the expansive language of *Hughes v. Oklahoma* that is quoted above at pages 1304–1305. *Philadelphia* did not expand the reach of the Commerce clause. It merely explained prior inconsistencies that had created apparent exceptions to the traditional rule.

The Court reiterated that the Commerce clause "through the years" reflected an alertness to State efforts at " 'economic isolation' and protectionism," the clearest example of which being a "law that overtly blocks the flow of interstate commerce at a State's borders." 437 U.S. at 624, 98 S.Ct. at 2535. That this language would not be applicable to the instant case is shown by the Court's distinguishing State laws restricting a nonresident's access to a State's natural resources. 437 U.S. at 627, 98 S.Ct. at 2537. The "State border" language was advanced in the context of preferring residents over nonresident "consumers," with the effect of preventing "privately owned articles of trade" from being sold in interstate trade. As stated by the Court:

> [A] State may not accord its own inhabitants a preferred right of access over con-

**20.** The apparent conflict between *Douglas* and *Philadelphia* on this point is discussed *infra.*

**21.** See discussion at section VI, *infra.*

**22.** Although *Hughes* overruled *Geer,* the *Hughes* Court supported its decision to do so by noting the increasing prevalence of the *Geer* dissent and concurrent decline of the majority opinion. The dissenters in *Geer,* in language quoted without comment in *Hughes,* expressed the view that an animal did not become an article of commerce until caught. "When any animal . . . is lawfully killed for the purposes of food or other uses of man, it becomes an article of commerce, and its use cannot be limited to citizens of one State to the exclusion of citizens of another State." *Id.*

sumers in other States to natural resources located within its borders. *West v. Kansas Natural Gas Co.*, 221 U.S. 229, 55 L.Ed. 716, 31 S.Ct. 564; *Pennsylvania v. West Virginia*, 262 U.S. 553, 67 L.Ed. 1117, 43 S.Ct. 658, 1 Ohio L.Abs. 627, 32 A.L.R. 300. These cases stand for the basic principle that a "State is without power to prevent privately owned articles of trade from being shipped and sold in interstate commerce on the ground that they are required to satisfy local demands or because they are needed by the people of the State." [6] *Foster Packing Co. v. Haydel, supra* [278 U.S.] at 10, 73 L.Ed. 147, 49 S.Ct. 1 [at 3]. (footnote in original)

437 U.S. at 627, 98 S.Ct. at 2537.[23]

Thus, after a closer reading of the applicable precedent, and absent any restriction on commercial trade in crabs after they are harvested, and recognizing that Marylanders are not precluded in any way by Virginia from coming to Virginia as consumers of a natural resource, and also recognizing the want of any Congressional pre-emption as to the blue crab fishery, and the lack of any substantial support for an expansive reading of the *Douglas* dictum, the Court is not convinced that the Commerce clause reaches a State law whose effect is to prohibit a nonresident commercial crabber from catching crabs in Virginia.

Plaintiffs have not established that unharvested crabs are articles of commerce. There is no suggestion that the interstate trade of harvested crabs has been hampered. As for the Maryland crabber, except for the *Douglas* dictum, there is no convincing support that his interest in traversing the State boundary to harvest crabs is within the purview of the Commerce clause either as an article of commerce or as one engaged in the associated intercourse thereof. Fortunately, and as a practical matter, the ruling of the Court as to the Privileges and Immunities clause, which definitely applies to the instant situation, obviates the need for a more definite determination on this point.

## VI

■ Plaintiffs assert that the Virginia statutes as applied to those plaintiffs who operate federally licensed boats are preempted by the federal licensing statute and must yield to them pursuant to the Supremacy clause of the Constitution. Although the holding of this Court encompasses the federally licensed plaintiffs as well as non-licensed fishermen, the Court would note that plaintiffs clearly prevail on this point under the controlling decision in *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977). *See also Gibbons v. Ogden*, 9 Wheat 1, 6 L.Ed. 23 (1824).

## VII

■ Finally, plaintiffs challenge the Virginia residency statutes as infringing on the right to travel in violation of the Equal Protection clause of the Fourteenth Amendment. The Court notes that the plaintiffs have not challenged the durational aspect of the Virginia statutes which certainly would raise a more compelling question than a challenge merely to the residency requirement. Although the Supreme Court has struck down durational residency requirements under the Equal Protection clause, a residency requirement uniformly applied does not violate the clause in and of itself. *See Memorial Hospital v. Maricopa County*, 415 U.S. 250, 254–55, 94 S.Ct. 1076, 1080–1081, 39 L.Ed.2d 306 (1974). Plaintiffs' failure to rebut defendants' and defendant intervenor's responses to their argument in this regard indicates that their contention on this point is subordinate to their other arguments. Considering the Court's ruling as to the Privileges and Immunities clause, it need not reach a decision as to this clause.

---

**23.** In footnote 6 of *Philadelphia* the Court refused to decide "New Jersey's power, consistent with the Commerce clause, to restrict to state residents access to state-owned resources, *compare Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 283–287 [97 S.Ct. 1740, 1751–1753, 52 L.Ed.2d 304], *with id.* at 287–290 [97 S.Ct. at 1753–1754] (Rehnquist, J., concurring and dissenting); *Toomer v. Witsell*, 334 U.S. 385 [68 S.Ct. 1156, 92 L.Ed. 1460]."

## VIII

To the extent that the Virginia statutes proscribe nonresidents from commercially crabbing in Virginia waters, they are repugnant to the Privileges and Immunities clause and must fall. Accordingly, as there are no material facts in dispute, plaintiffs' motion for summary judgment will be granted and an appropriate order shall issue.

Since it is recognized that some modifications in the present practice and regulations and some interstate agreements may be requisite in light of this decision the Court requests the parties to file briefs within 20 days as to a possible transition before full implementation of this decision.

And it is so ORDERED.